Case No. 25-70008

*In the*

*United States Court of Appeals*

*for the Fifth Circuit*

_____

RONALD JAMES HAMILTON,
*Petitioner-Appellant*

v.

ERIC GUERRERO, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS
DIVISION,

*Respondent-Appellee.*
_____

On Appeal from the United States District Court
for the Southern District of Texas, Houston Division
4:15-CV-1996; Hon. Judge Alfred H. Bennett, Judge Presiding
_____

**BRIEF IN SUPPORT OF
MOTION FOR CERTIFICATE OF APPEALABILITY**
_____

Jonathan D. Landers                     Bryan W.L. Garris
State Bar. No. 24070101                 State Bar. No. 24079945
1018 Preston St., 8th Floor             1018 Preston St., 8th Floor
Houston, Texas  77002                   Houston, Texas  77002
(713) 685-5000 – Telephone              (832) 722-8915 - Telephone
Jlanders.law@gmail.com                  Bryan@txdefense.net
ATTORNEYS FOR PETITIONER HAMILTON

**\*ORAL ARGUMENT REQUESTED IN THIS CAPITAL/HABEAS CASE\***

## CERTIFICATE OF INTERESTED PERSONS

(1) *Ronald James Hamilton v. Eric Guerrero, Director,* Cause no. 25-70008

(2) The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal. No corporate disclosure statement is required in this case. FED. R. APP. P. 26.1. No known people have a financial interest in the outcome of this case. Fifth Cir. R. 28.2. The Respondent/Appellee is represented by Lucas Wallace of the Texas Attorney General's Office, and was previously represented by Stephen M. Hoffman from the same office. Appellant was represented by Patrick McCann during his initial state habeas proceedings.

/s/ Jonathan Landers

_____

Date: June 30, 2025          Jonathan Landers

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument would benefit this Honorable Court – helping explore, identify, and actualize the full strength of Hamilton's presentation that certificates of appealability should issue with respect to the underlying claims raised herein – particularly with such a voluminous record and the nature of this being a capital case. This case involves constitutional errors in the punishment phase of Mr. Hamilton's capital trial, which took place after he pleaded guilty to capital murder. Evidence suppressed by the prosecution but discovered during post-conviction proceedings shows that Ronald Hamilton did not commit an extraneous murder presented against him during the punishment proceeding, and his trial counsel's ineffectiveness and conflict of interest further prejudiced the proceeding. The state district court, which held an evidentiary hearing, found that Mr. Hamilton had not committed the extraneous murder and recommended a grant of relief, but the Texas Court of Criminal Appeals and the district court both denied relief.

Undersigned counsel looks forward to the opportunity to discuss and present these issues, and answer your questions.

# TABLE OF CONTENTS

Certificate of Interested Persons .................................................................. i

Statement Regarding Oral Argument ....................................................... ii

Table of Contents ..................................................................................... iii

Table of Authorities ................................................................................. vi

Jurisdictional Statement ............................................................................1

Statement of Issues....................................................................................2

Statement of the Case and Facts ...............................................................3

   I.    Introduction...................................................................................3

   II.    Procedural History.......................................................................4

   III.    The Houston Police Department investigated two convenience store robberies gone wrong.............................................................6

   IV.    Trial: the prosecution misleads the defense about the existence of forensic evidence, and the State's punishment case focuses on the Holman murder. ........8

     A.    Pretrial proceedings. .................................................................8

     B.    The State's punishment case relied heavily on the idea Hamilton committed the Holman murder. ........................................................9

     C.    The remainder of the State's punishment case. .....................15

     D.    The defense's punishment case. .............................................18

     E.    Closing argument centers around the Holman murder...........................19

V.    Post-Conviction proceedings show that the prosecution withheld evidence and uncovers additional proof that Mr. Hamilton did not commit the Holman murder. .....................................................................................................20

    A.    The District Attorney agrees that no forensic testing was performed prior to trial – and agrees to testing. ......................................................................20

    B.    Hamilton presented his Due Process and Eighth Amendment claims to the state courts...........................................................................................................21

    C.    The District Attorney's briefing shows that the jury never learned that Hamilton was excluded from the fingerprints found on the 40-ounce bottle..22

VI.    The evidentiary hearing: "I'm so sure.  I would put my life on it." ..........23

VII.    The trial court recommends a new punishment hearing, the CCA denies relief.    ……………………………………………………………………33

Summary of the Argument.....................................................................................35

Standard of Review................................................................................................37

Argument.................................................................................................................38

I.    A Certificate of appealability should issue for Hamilton's claim that the Eighth Amendment's prohibition against cruel and unusual punishment was violated by a death sentence grounded upon evidence that has been revealed to be materially inaccurate. ...........................................................................................38

II.    A certificate of appealability should issue for Hamilton's claim the trial prosecutors denied Mr. Hamilton Due Process by suppressing exculpatory fingerprint comparison results relevant to the extraneous capital murder. .........45

III.    A certificate of appealability should issue for Hamilton's claim he received ineffective assistance of trial counsel during the punishment phase of his trial. 56

    A.    Jurists of reason would debate whether trial counsel repeatedly failed to object to harmful, but inadmissible, extraneous bad act testimony.................59

iv

B.     Jurists of reason would debate whether trial counsel was ineffective for failing to investigate, prepare for, and effectively cross-examine Joseph Montoyer – the "jailhouse snitch" who testified that he overheard Hamilton admit to committing the extraneous capital murder. ......................................64

C.     Jurists of reason would debate whether, in the alternative to the *Brady* claim, trial counsel was ineffective for failing to establish the shooter touched the bottle...........................................................................................................68

IV.    A certificate of appealability should issue with respect to Hamilton's Sixth Amendment claim that his trial counsel labored under an actual conflict of interest. ...............................................................................................................72

A.     Jurists of reason could debate whether trial counsel operated under an actual conflict of interest that adversely affected trial counsel's representation and would disagree with the District Court's determination that Hamilton failed to meet his AEDPA burden.............................................................................72

B.     Jurists of reason would disagree with the District Court's determination that this claim is procedurally barred.............................................................79

Conclusion ...........................................................................................................81

Certificate of Service ...........................................................................................82

Certificate of Compliance .....................................................................................82

**<u>Cases</u>**

*Acosta v. State*, 233 S.W.3d 349 (2007) ...................................................... 79

*Amaya v. State*, 677 S.W.2d 159
(Tex.App.—Houston [1ˢᵗ Dist.] 1984, pet. ref'd) ...................................... 80

*Andrew v. White*, 145 S. Ct. 75 (2025) ........................................................ 39

*Andrus v. Tex.*, 140 S. Ct. 1875 (2020) .................................................. 50, 57

*Beard v. Kindler*, 130 S.Ct. 612 (2009) ...................................................... 81

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................ *passim*

*Brewer v. Lumpkin,* 66 F.4th 558 (5th Cir. 2023) ....................................... 56

*Buck v. Davis*, 137 S. Ct. 759 (2017) ........................................................... 37

*Carty v. Thaler*, 583 F.3d 244 (5th Cir. 2009) ............................................ 38

*Cole v. Lumpkin*, 2022 WL 3710723 (5th Cir. 2022) ................................. 56

*Cone v. Bell*, 556 U.S. 449 (2009) ............................................................... 46

*Cuyler v. Sullivan*, 446 U.S. 336 (1980) ................................................. 73, 79

*Delacerda v. State,* 2021 WL 2674501 (Tex. Crim. App. 2021) ............... 63

*Ex parte Hamilton*, 2015 WL 3899185 (Tex. Crim. App. 2015) ................ 4

*Ex parte Hamilton*, 2020 WL 6588560 (Tex. Crim. App. 2020) .............. 56

*Ex parte McCormick*, 645 S.W.2d 801 (Tex.Crim.App. 1983).................. 80

*Ex parte Parham*, 611 S.W.2d 103 (Tex.Crim.App. 1981)........................ 80

*Ex parte Salinas*, 664 S.W.3d 894 (Tex. Crim. App. 2022) ........................ 62

*Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018) ........................... 46, 52, 45

*Ford v. Cockrell,* 315 F.Supp.2d 831 (W.D. Tex. 2004) ............................ 66

*Glasser v. U.S.*, 315 U.S. 60 (1942) ............................................................. 73

*Glivens v. State*, 918 S.W.2d 30
(Tex.App.—Houston [1st Dist.] 1996, pet. ref'd) ...................................... 62

*Glossip v. Oklahoma*, 145 S. Ct. 612 (2025) ............................................. 51

*Hamilton v. State*, 2004 WL 3094382 (Tex. Crim. App. 2004) .................. 4

*Hamilton v. Tex.*, 545 U.S. 1130 (2005) .................................................... 4

*Henderson v. Norris,* 118 F.3d 1283 (8th Cir. 1997) ................................ 67

*Hernandez v. Johnson,* 213 F.3d 243 (5th Cir. 2000) ................................ 41

*Holloway v. Arkansas*, 435 U.S. 475 (1978) ............................................. 73

*Johnson v. Mississippi*, 486 U.S. 578 (1988) ....................................... 39, 81

*Kyles v. Whitley*, 514 U.S. 419 (1995) ....................................................... 51

*Lyons v. McCotter*, 770 F.2d 529 (5th Cir. 1985) ...................................... 62

*Martinez v. Ryan*, 132 S. Ct. 1309 (2012) ................................................. 58

*Mickens v. Taylor*, 535 U.S. 162 (2002) .................................................... 73

*McFarland v. Lumpkin,* 26 F.4th 314 (5th Cir. 2022) ............................... 66

*Perillo v. Johnson*, 205 F.3d 775 (5th Cir. 2000) ............................. 73, 76-77

*Roethel v. State*, 80 S.W.3d 276 (Tex. App.—Austin 2002, no pet.).......... 60

*Shinn v. Ramirez,* 596 U.S. 366 (2022) ....................................................... 56

*Smith v. Cain,* 565 U.S. 73 (2012) ............................................................... 51

*Spriggs v. Collins*, 993 F.2d 85 (5th Cir. 1993) ........................................... 62

*Strickler v. Greene*, 527 U.S. 263 (1999) .................................................... 46

*Strickland v. Washington,* 466 U.S. 668 (1984) .......................................... 57

*Thompson v. State*, 9 S.W.3d 808 (Tex. Crim. App. 1999) ......................... 80

*Tong v. Lumpkin*, 90 F.4th 857 (5th Cir. 2024) .................................... 38, 56

*Trevino v. Thaler*, 133 S. Ct. 1911 (U.S. 2013) ................................. 58, 79-80

*United States v. Agurs*, 427 U.S. 97 (1976) ................................................. 46

*U.S. v. Bagley,* 473 U.S. 667 (1985) ............................................................ 51

*U.S. v. Infante*, 404 F.3d. 376 (5th Cir. 2005) ................................. 76, 77, 79

*Wilkins v. State,* 2010 WL 4117677 (Tex. Crim. App. 2010) .................... 63

*Wood v. Georgia*, 450 U.S. 261 (1981) ....................................................... 73

*Young v. Davis*, 835 F.3d 520 (5th Cir. 2016) ............................................ 38

## Constitutional Provisions, Statutes, and Rules

U.S. CONST. amend VI .................................................................... *passim*

U.S. CONST. amend VIII ................................................................. *passim*

U.S. CONST. amend V, XIV ............................................................ *passim*

TEX. CODE CRIM. PROC. art. 37.07 sec. (3)(g) .............................. 60

TEX. CODE CRIM. PROC. art. 37.071 sec. 2(a)(1) ......................................... 60

28 U.S.C. § 2241 ...................................................................... 1

28 U.S.C. § 2253 ................................................................... 1, 37

28 U.S.C. § 2254 ................................................................. *passim*

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction over Ronald Hamilton's ("Hamilton's") Petition and Amended Petition for Writ of Habeas Corpus, challenging his State criminal conviction, pursuant to 28 U.S.C. §§ 2241, 2254. This Court has appellate jurisdiction under 28 U.S.C. § 1291, and has jurisdiction to consider the motion for certificate of appealability. 28 U.S.C. § 2253.

Hamilton timely filed his original federal petition on June 17, 2016. ROA.64. Hamilton timely filed his Amended Petition on April 26, 2021. ROA.1045-1915. The District Court issued its Final Judgment and Memorandum and Order denying Hamilton's Amended Petition, and disposing of his claims, on April 8, 2025. ROA.2404-2492. Hamilton timely filed notice of appeal from the judgment on April 14, 2025. ROA.2493. The deadline for the filing of Hamilton's motion for certificate of appealability and supporting brief is July 25, 2025. Both are timely filed.

I.      **A certificate of appealability should issue for Hamilton's claim that the Eighth Amendment's prohibition against cruel and unusual punishment was violated by a death sentence grounded upon evidence that has been revealed to be materially inaccurate.**

II.      **A certificate of appealability should issue for Hamilton's claim that the trial prosecutors denied Mr. Hamilton Due Process by suppressing exculpatory fingerprint comparison results relevant to the extraneous capital murder.**

III.      **A certificate of appealability should issue for Hamilton's claim he received ineffective assistance of trial counsel during the punishment phase of his trial.**

IV.      **A certificate of appealability should issue with respect to Hamilton's Sixth Amendment claim that his trial counsel labored under an actual conflict of interest.**

## STATEMENT OF THE CASE AND FACTS

## I.   INTRODUCTION.

Ronald Hamilton pleaded guilty to killing Ismail Matalkah during a convenience store robbery.[1]  At the punishment phase, prosecutors emphasized a second capital murder, allegedly committed by Hamilton.[2]  Based on evidence uncovered after trial, the state post-conviction court found that "Hamilton has proven by a preponderance of the evidence that the State presented materially inaccurate evidence" that Hamilton had committed this second murder, and found it more likely the murder was committed by another man, Marshall Knight.  ROA.1007.

Evidence from the post-conviction hearing showed the prosecution suppressed material evidence.  Before trial, the prosecution knew a fingerprint on a bottle handled by the Holman shooter had been compared to Hamilton's and excluded him as the source.  The prosecution lied to Hamilton's counsel, and to the trial court, and stated there were no fingerprint comparisons.

---

[1] The offense of conviction is referred to as the "Yellowstone murder."  The extraneous murder is referred to as the "Holman murder."

[2] The prosecution called nine witnesses and presented hundreds of pages of testimony attempting to prove that Mr. Hamilton committed the Holman murder.

3

Forensic testing in 2017 identified the fingerprint as belonging to Marshall Knight, a man with similar physical traits and a prior aggravated robbery arrest. During post-conviction proceedings, Knight, through counsel, invoked the Fifth Amendment and refused to answer questions about the bottle or the Holman murder.

The state district court recommended a new punishment trial for Mr. Hamilton due to the prosecution's *Brady* violation and use of false and misleading evidence. ROA.12624. The Texas Court of Criminal Appeals ("TCCA") denied relief in a six-page unpublished order. ROA.8625-8631.

## II.    PROCEDURAL HISTORY

Ronald Hamilton pleaded guilty to capital murder and was sentenced to death on November 12, 2002. ROA.2965-2966. His direct appeal was denied by the TCCA and the U.S. Supreme Court denied certiorari. *Hamilton v. State*, 2004 WL 3094382 (Tex. Crim. App. 2004); *Hamilton v. Tex.*, 545 U.S. 1130 (2005). He filed a state habeas application on September 15, 2004; the state district court recommended denying relief on November 25, 2014, and the TCCA adopted these findings on June 24, 2015. *Ex parte Hamilton*, WR-78,114-01, 2015 WL 3899185 (Tex. Crim. App. 2015).

Hamilton filed his federal habeas petition on June 17, 2016. ROA.64-527. During the proceedings, the district court granted Hamilton's opposed motion to stay and abate to allow presentation of additional claims in state court. ROA.986-986.

Hamilton filed a subsequent habeas application in the 180th District Court of Harris County, Texas. ROA.8088-8611. After an evidentiary hearing, the 180th District Court recommended a new punishment trial. ROA.12623-12688. The TCCA later denied relief in an unpublished order. ROA.8625-8631.

Hamilton returned to federal court and filed an amended habeas petition. ROA.1045-1915. After extensive briefing by both parties, the district court denied all claims raised in the habeas petition and denied certificates of appealability. ROA.2404-2492.[3]

---

[3] Hamilton specifically requested a certificate of appealability for any claim not granted on its merits. ROA.1284.

## III.   THE HOUSTON POLICE DEPARTMENT INVESTIGATED TWO CONVENIENCE STORE ROBBERIES GONE WRONG.[4]

On November 7, 2001, around 6:45 pm, convenience store clerk Ismail Matalkah was shot and killed during a robbery at 3300 Yellowstone, in Houston, Texas.  A tip received on December 7, 2001, led police to Hamilton and co-defendant Shawon Smith, who were arrested a month later.

Meanwhile, on December 8, 2001, Son Huynh was killed during a robbery at 3235 Holman.  The suspects were described as "two young black males, who fled the scene in a small two door dark colored car."  ROA.11723.  A "40 oz. Schlitz Malt Liquor beer bottle" was found "on top of the metal bar on the south end" of the store.  ROA.11727.  Print examiner Debbie Benningfield came to the scene and collected the bottle for fingerprint and DNA testing.  ROA.11736.

On December 10, 2001, Investigators Park and Hoffmaster, working the Holman murder, found witnesses Charles Douglas and Wanda Johnson, who were present before, during, and after the Holman shooting.  The witnesses provided both oral and written statements to the police, and the investigators noted about Wanda

---

[4] The facts in this subsection are supported by the offense reports for each respective murder. ROA.11721-11748, 11847-11940; *see also* ROA.8660 (parties agreeing trial court can consider this evidence).

Johnson's written statement that "IT WAS NOT MENTIONED IN THE STATEMENT BUT SHE ALSO SAW THE SAME MAN SIT DOWN AN EMPTY 40 ONCE BEER BOTTLE ON THE RAIL THAT RUNS ALONG THE BURKETT SIDE OF THE STORE." ROA.11732. The man who sat the bottle down was the same man who shot Huynh.

The offense report shows no indication that the prints were compared to any suspect or checked through the Automated Fingerprint Identification System ("AFIS").

A break in the Yellowstone murder came on January 21, 2002, when police responded to a family disturbance. The complainant, Brooke Rogers, told police that her child's father, Hamilton, had killed a clerk at the gas station on Yellowstone and 288. Hamilton was arrested for Criminal Mischief, and homicide detectives were alerted. In the following days, police obtained statements from Rogers explaining that Hamilton had confessed the Yellowstone murder to her; co-defendant Shawon Smith, who confessed to driving after the shooting; and friend Billy Norris, who also said Hamilton had confessed. ROA.11892-11908.

Hamilton then became the main suspect in the Holman murder. At the end of January, Detectives Park and Hoffmaster showed a lineup including his mugshot to

eyewitnesses Douglas and Johnson, who had received copies of the police sketch of the suspect seven weeks earlier. Both witnesses picked Hamilton as Mr. Huynh's killer. ROA.11746.

Pursuant to policy, the Holman murder offense report omitted that Hamilton and Smith had been excluded as sources of all fingerprints at the scene – including the print on the bottle placed down by the shooter just before killing Huynh.

## IV. TRIAL: THE PROSECUTION MISLEADS THE DEFENSE ABOUT THE EXISTENCE OF FORENSIC EVIDENCE, AND THE STATE'S PUNISHMENT CASE FOCUSES ON THE HOLMAN MURDER.

### A. Pretrial proceedings.

Hamilton was charged with Matalkah's murder (the Yellowstone murder) and prosecutors introduced the Holman murder as extraneous punishment evidence. Before trial, the court granted defense motions for discovery of all "results of examinations" and for *Brady* material. ROA.2678, 2769. At the pretrial hearing, prosecutor Davidson misrepresented to the trial court and defense that there were no fingerprint comparisons. ROA.3110. The court confirmed that all discovery orders applied to both the Yellowstone and Holman murders. ROA.3115-3116.[5]

_____

[5] Prior to revealing the fingerprints had been compared prior to trial, the Harris County District Attorney agreed that "even during the October 7, 2002, pretrial conference, the State informed the

**B.    The State's punishment case relied heavily on the idea Hamilton committed the Holman murder.**

The prosecution heavily relied on the Holman murder to argue for a death sentence. Their first witness on the subject was jailhouse informant Joseph Montoyer, who claimed that while cutting Hamilton's hair in jail, he overheard mention of a "Holman Street" robbery.[6] On cross-examination, it emerged that Montoyer's trial account was absent from his initial statements and that he was referring only to a general area, not a specific incident. It was also revealed that although prosecutor Davidson misrepresented that no deals were made with Montoyer in exchange for his testimony, Montoyer was later recalled to confirm prosecutors had agreed to reduce his bond for his cooperation.  ROA.6098-6099, 6582-6587.

Defense counsel Loretta Muldrow, failed to impeach Montoyer on key facts, failed to impeach him with five of his seven convictions for felonies or crimes of moral turpitude, and his use of multiple aliases.  During trial and initial post-conviction proceedings, Muldrow realized she had previously represented Montoyer

---

trial court there were no reports of any scientific tests like DNA or fingerprint comparisons (2 R-R- at 8-11)."  ROA.12001.

[6] ROA.6095-6117, 6574-6601.

in the very case where he received a benefit for providing evidence against Hamilton. ROA.6573-6590; 8400. Muldrow admitted her cross-examination may have been affected by the sudden discovery of this potential conflict – which distracted her. ROA.8400.

At trial, only two of Montoyer's prior felonies—a 1984 marijuana possession and a 1994 forgery—were disclosed. In reality, he had five additional felony convictions: possession of a controlled substance (1999), felony theft (1995, 1999), and two more forgery offenses (1994, 1997). ROA.1293-1349. Four of these involved moral turpitude and directly impacted his credibility, yet defense counsel Muldrow failed to raise them during cross-examination. The jury was also never informed that Montoyer lied to them – falsely claiming to have only two prior felony convictions. ROA.6114.

Muldrow also failed to impeach Montoyer for using multiple aliases, including: Joseph Darrell Metoyer, Joe Montoya, Joseph Montego, and Joseph Marshall. ROA.1293-1349. Additionally, Muldrow failed to challenge Montoyer's trial claim that he overheard the information while cutting Hamilton's hair, despite his earlier recorded statement saying he learned it while helping Hamilton in the law library. ROA. 1352, 6101.

Officer Dunn testified that he arrived at the Holman convenience store around 6 p.m. on December 8, 2001, and found Huynh lying in a pool of blood with officers already on scene.  ROA.6117-6143.  Twenty pictures of the crime scene were introduced.  ROA.6895-6933.  Officer Thomas, who knew Huynh and his family, testified that Huynh's wife had recently passed and identified family members in court.  ROA.6133-6143.  Officer Thomas also reviewed the crime scene photos. ROA.6137.

Eyewitnesses Douglas and Johnson testified they were heading to the Holman store on December 8, 2001, to buy cigarettes and beer.  ROA.6143-6218.  Douglas, who had been drinking, saw a man at the front counter, stepped outside, and then witnessed a brief struggle through the front door before the man pulled a gun and shot Huynh.  Douglas re-entered the store while the shooter was still inside, saw him leave, and watched him get into a dark blue or grey car that drove off.  ROA.6158-6165.  Three days later, Douglas worked with a sketch artist to produce a composite

sketch, which he was given to take home. Douglas initially described the shooter as a teenager weighing around 140 pounds. ROA.6169-6178.[7]

At trial, Johnson testified she accompanied Douglas to the Holman store on December 8, 2021. It was dark when they arrived, and she saw a dark-colored two-door car parked beside the store. A man was urinating near a bench and a 40-ounce bottle of liquor, while a heavyset Black male sat in the car's driver seat. As she and Douglas approached the store, the man zipped up his pants and entered ahead of them. After paying for her items, Johnson stepped outside, heard a gunshot, saw Huynh fall, and afterwards ran home. ROA.6193-6204.

Johnson initially told police the suspect was in his late teens and had an "afro" though she later denied making that statement at trial. ROA.6189, 6210, 11321. Like Douglas, she was given a copy of the police sketch and said she looked at it daily in the weeks leading up to identifying Hamilton in a photo lineup. ROA.6213-6214.

---

[7] Hamilton, who was born in April 1977, was 24 years old. Marshall Dwayne Knight was 20 at the time of the murder. Houston Police Department Records show Knight weighed 140 lbs. Hr'g Def. Ex. 28.

Importantly, although the police report is clear that Wanda "saw the [shooter] sit down an empty 40 once beer bottle on the rail that runs along the Burkett side of the store[,]" the jury never learned this fact. ROA.11425, ROA.6193-6219. This rendered any testimony regarding fingerprints on the bottle meaningless and without exculpatory context.

On the third day of trial, Detective Park testified that the suspect and vehicle descriptions in the Holman and Yellowstone murders were similar. ROA.6239-6247. However, she made no effort to verify whether the car used in the Yellowstone murder – owned by co-defendant Shawon Smith – was operable at the time of the Holman murder. ROA.6270. It was later confirmed the car was inoperable and impounded on the Holman murder date. ROA.6329-6332.

During cross-examination, Detective Park testified that a 40-ounce beer bottle – over which the shooter had urinated – was collected. Officer Park testified there were "prints on the bottle[,]" and, when asked "[d]id it tie back to my client" Park answered no. ROA.6260-6261. She was also asked if there was "[a]ny physical evidence that came back to my client or to Shawn Smith" and replied "[n]o, not in this investigation." ROA.6261. This testimony was devoid of value for the defense, because the jury never learned that the shooter had actually handled the bottle, and it was never established that the identifiable prints on the bottle were compared to

13

Hamilton's and that he was excluded as leaving the fingerprints.[8]  Park testified that

no DNA samples were obtained.  ROA.6275.

The defense aimed to show Hamilton was not involved in the Holman murder

by proving Shawon Smith's car was unavailable that day.  However, this strategy

was undermined by Park's false testimony that Smith was not a suspect.  ROA.6255-

6256.  Recently discovered fingerprint envelopes, in HPD's custody since December

2001, list Smith as a suspect.  ROA.11379.

Dr. Paul Shrode testified about the autopsies of Matalkah and Huynh, though

he had not performed Huynh's.  ROA.6280-6316.  His testimony aimed to highlight

similarities between the shootings and to present graphic autopsy photos. Fourteen

images from Huynh's autopsy were admitted, including one of his brain shown to

the jury for impactful dramatic effect.  ROA.6310.  Next, Huynh's daughter testified,

and a photo of him in a tuxedo was introduced.  ROA.6317-6322.

---

[8] The State's briefing on this issue before the state court, discussed *infra*, shows that a reasonable interpretation of Park's testimony is that no forensic comparisons were conducted in this case.  The State, after reviewing their file and the trial testimony and representations of the trial prosecutors to the trial court and trial defense counsel that there were no fingerprint comparisons, repeatedly took the position that there had been no comparison testing conducted.

## C. The remainder of the State's punishment case.

In addition to evidence of the Yellowstone murder, and the disputed extraneous Holman murder, the state introduced other "bad acts" during the punishment phase. Much of this evidence was inadmissible due to lack of proper notice by the prosecution, but defense counsel failed to object.[9] The additional prior bad acts included:

- Billy Norris, a friend of Hamilton's, testified that Hamilton said he would "do something to him" if Norris were to "tell on him," though Norris described the comment as made "out of anger." ROA.5715-5716.

- Multiple prior bad acts were introduced through testimony by Brooke Rogers, the mother of Hamilton's child, including:

  o Hamilton was absent from his child's life and offered no support. ROA.5772-5776.

  o Hamilton dated other women while still involved with Rogers. ROA.5771. **No notice given.**

---

[9] The complete notices provided to defense counsel were admitted at the post-conviction hearing before the state district court. ROA.11465-11485.

- o Hamilton demanded sex from Rogers while she was seeing someone else and became angry when she refused. ROA.5779-5780. **No notice given.**

- o After another man commented to Rogers, Hamilton allegedly hit, kicked, and pushed her while she pushed a stroller. Hamilton then took their baby and didn't return until the next day. ROA.5792-5796. **No notice given.**

- o Hamilton often called Rogers degrading names. ROA.5805. **No notice given.**

- o During an argument, Rogers sprayed Hamilton in the face with air freshener, and Hamilton threw a phone at her head. ROA.5802-5805. A police officer also testified that Rogers reported being punched three times, had "goose egg size knots[,]" and was crying. ROA.5982-5990. Hamilton was not arrested.[10]

- o At some point, Hamilton allegedly shot at Rogers from across a field. ROA.5814-5816. **No notice given.**

- o Hamilton threatened to harm Rogers if she told anyone about his involvement in the Yellowstone murder. ROA.5789-5790. **No notice given.**

- On September 16, 1994, at age 17, Hamilton was arrested and convicted for possessing less than one gram of crack cocaine. ROA.5947-5949.

---

[10] It is possible the noticed offense – "Assault – July 6, 1998 – Harris County, Texas CW:Brook Rogers" referred to this allegation. ROA11468.

- On June 5, 1997, Hamilton was arrested and convicted for fleeing from a house where marijuana was sold. ROA.5951-5980.

- On September 13, 1998, Hamilton was stopped driving a truck (incorrectly) believed stolen; a pistol and five grams of cocaine were found, leading to a cocaine possession conviction. ROA.6022-6032.

- Hamilton committed multiple jail infractions: a fight observed on September 30, 1997; placing hair remover in another inmate's shampoo in August 1997; receiving two food trays in June 2002; and fighting inmate Jason Gurley on August 5, 2002. ROA.6000, 6034-36, 6047-48, 6061-6068.

- Gurley testified Hamilton and others harassed him with name-calling and derogatory remarks, would make homosexual references, and would look at him funny while taking showers. ROA.6061-6062. **No notice given.**

- Montoyer, previously represented by Hamilton's lawyer, described Hamilton as "a bully type person," who "basically picked on Caucasian people," "bullied a tank over the televisions," and would fight "Caucasian race people and one Hispanic guy. He wouldn't give them a chance. He'd just walk up to them and beat them." ROA.6104. **No notice given.**

### D.    The defense's punishment case.

The defense's plan to defend against the Holman murder was upended by the prosecution.    The defense sought to prove Hamilton's innocence through the testimony of co-defendant Shawon Smith, a strategy formed on the "mistaken belief that the State would proceed with trial under its oath to seek justice by not impeding Mr. Hamilton's right to a fair trial." ROA.7577.  The defense was "stunned" by the "legal farce the State maneuvered in reciting to the court its reason why Mr. Smith" no longer had plea deal in place, which meant Smith would have to assert his Fifth Amendment right to any questions asked at trial.  *Id.*

Despite an inadequate mitigation investigation, the defense presented compelling evidence about Hamilton's trouble upbringing.  Both his parents were drug addicts; his mother used alcohol and marijuana while pregnant, and his father – often absent and abusive – spent most of Hamilton's life in prison.  Due to his mother's addiction and prostitution, Hamilton was left in the care of a disabled grandmother and substance-abusing uncles.  Multiple witnesses confirmed these details, and an educational diagnostician testified that Hamilton suffered from severe learning disabilities and neurological deficits that contributed to his life struggles. ROA.1090-1095; 2409.

### E. Closing argument centers around the Holman murder.

In its initial closing arguments, the prosecution repeatedly emphasized the Holman murder, arguing "on December 8th of 2001, a little over one month later, the defendant takes a gun, goes into the Tucson store and in a cold-blooded manner blows away Mr. Tucson." ROA.6670. It was said that Hamilton "likes guns because on December 8th of 2001 he blew away Mr. Tucson with one of his guns, another unarmed man." ROA.6673. The jury was told Hamilton killed Mr. Tucson out of frustration over being unemployed. ROA.6675. The prosecutor spent four pages arguing Hamilton committed the Holman murder and misled the jury by asking "[i]s it just a coincidence that there weren't any prints found at either scene?" ROA.6680-6683.

In the final closing argument, the prosecution reiterated that Hamilton was on trial for two capital murders. The defense's claim – that Shawon Smith's car was inoperable during the Holman murder – was dismissed. The prosecution doubled down, asserting both Smith and Hamilton committed the crime. ROA.6742-6743. They also misrepresented that there was no DNA evidence available because witnesses delayed coming forward, leaving nothing to collect. ROA.6744-6745.

The jury sentenced Hamilton to death without knowing that the actual Holman shooter placed the 40-ounce bottle at the scene, that Hamilton's fingerprints were compared to those on the bottle, and that he was excluded as the source.

## V. POST-CONVICTION PROCEEDINGS SHOW THAT THE PROSECUTION WITHHELD EVIDENCE AND UNCOVERS ADDITIONAL PROOF THAT MR. HAMILTON DID NOT COMMIT THE HOLMAN MURDER.

### A. The District Attorney agrees that no forensic testing was performed prior to trial – and agrees to testing.

After the district court granted his motion to stay federal proceedings, Hamilton swore he had discovered untested evidence, maintained he did not kill Huynh, and requested forensic testing. ROA.8234. On July 17, 2017, with the Harris County District Attorney's agreement, the trial court ordered testing of evidence from the Holman murder scene. ROA.9772.

The 2017 forensic testing confirmed what Hamilton had long asserted: he was not the Holman shooter. Fingerprint analysis of the 40 oz. Schlitz Malt Liquor bottle recovered outside the store showed Hamilton was excluded as the source; the prints belonged to Marshall Dwayne Knight, a convicted felon with a history of armed robbery and weapons offenses. ROA.9982–9990, 11169–11171. Although a lab report initially deemed the DNA on the bottle's mouth and under Mr. Huynh's

fingernails "not suitable for comparison," DNA expert Dr. Robert Collins later testified that Hamilton was excluded from both samples. ROA.11097–11099.

### B. Hamilton presented his Due Process and Eighth Amendment claims to the state courts.

On November 2, 2017, Hamilton filed a subsequent state application for post-conviction relief. Claim One, related on newly tested forensic evidence, had three subparts. ROA.8096-8126. First, Hamilton argued that the jury relied on materially inaccurate evidence, violating the Eighth Amendment. ROA.8112. Second, Hamilton claimed a Fourteenth Amendment Due Process violation, asserting the State used false or misleading evidence central to the punishment decision. ROA.8116. Third, he alleged a *Brady v. Maryland* violation, noting the State failed to disclose pretrial forensic testing – evidence later revealed to have been actively concealed by police and prosecutors. ROA.8120, 8123.

On September 12, 2018, the TCCA found that Claim One met the requirements for a subsequent application and remanded it to the trial court for consideration. ROA.11947-11948.

**C.** **The District Attorney's briefing shows that the jury never learned that Hamilton was excluded from the fingerprints found on the 40-ounce bottle.**

The State's briefing in state court confirmed that the jury never learned the Holman shooter placed a 40-ounce bottle at the scene, or that Hamilton was excluded as the source of the fingerprints on it. In its reply, which included a review of trial testimony, the State argued "[t]here is no indication in the report that the prints or swabs were ever compared to either the applicant or to anyone else prior to trial," and that when the trial court granted Hamilton's request to test forensic evidence, "there was no indication in either the State or police files that these items had ever been compared to the applicant, or to anyone else." ROA.11986-11987. The State even faulted Hamilton for not requesting testing himself. ROA.11988. The State agreed to the 2017 forensic testing because they had checked with HPD and found "no indication that any forensic analysis had been conducted" in the case. ROA.11991.

The denial of pretrial forensic testing persisted through several hearings. When the State tried to block the evidentiary hearing, it argued that the issues all "ultimately revolve around materiality." ROA.11615. The State claimed no evidence was suppressed since Hamilton "got the results as soon as we had the results." ROA.11619. These arguments confirm that Detective Park's trial

22

testimony – that fingerprints did not "tie back" to Hamilton - did not inform the jury or defense team that the prints had been compared to Hamilton and he was excluded. Otherwise, the State – after having reviewed the trial record – would not have argued there were no pretrial comparisons.

Seventeen years after trial, and just days before the evidentiary hearing, the District Attorney's office finally disclosed that the fingerprints had been compared and Hamilton had been excluded as a source of fingerprints on the beer bottle – and that this exclusion had been known to trial prosecutor Barnett all along. ROA.423, 12328-12333. The admission came only after Hamilton inspected the evidence and filed a memorandum suggesting the comparison had occurred. The prosecution then produced a long-suppressed memo from its own file confirming Barnett's knowledge of the exculpatory result. ROA.11442.

## VI. THE EVIDENTIARY HEARING: "I'M SO SURE. I WOULD PUT MY LIFE ON IT."

At the habeas evidentiary hearing, Investigator Hoffmaster confirmed in his deposition that HPD collected a 40-ounce Schlitz malt liquor bottle from the metal rail outside the Holman store – an item they would only have taken if deemed significant. He acknowledged that, within two days of the murder, eyewitness Johnson told him the shooter had placed that same bottle on the rail moments before killing Huynh. ROA.12510-12511.

At the habeas evidentiary hearing, Johnson clearly testified – contrary to the TCCA's and federal district court's assertions – that she 1) saw the shooter place the bottle on the metal rail outside the store; and 2) never saw him pick it back up. Johnson testified:

Q. What happened next?

A. I told Charlie that I was going to be standing on the outside waiting for him. And while I was standing on the outside of the store, I was like right there where the arrow at.

Q. Yes, ma'am.

A. I was standing right there. While I was standing there, I seen a car pull up.

Q. Okay. Do you recall what the car looked like?

A. No, because it was dark.

Q. Okay. I understand. Okay. What happened when the car pulled up?

A. A guy got out the car drinking a 40-ounce. He turned the 40-ounce up. I guess -- I don't know if he finished it all or not. But when he finished it, he set it on this little iron bench and then he urinated over it and then he walked in the store.

Q. Okay. . . . Is the iron bench pictured in that exhibit in front of you?

A. Yes.

Q. And that's what I labeled Defense 31.[11]  So are you sure that the gentleman who got out of the car was drinking from that 40-ounce?

A. Yes.

Q. And are you sure that he set it down actually on the railing?

A. Yes.

Q. Are you positive it was a 40-ounce bottle?

A. Yes.

. . .

Q. Okay.  And then after the gentleman urinated over the bottle, what happened next?

A. He went in the store.

. . .

Q. Okay.

A. On the other side.  When he went in the store, he was like leaning over, just looking, looking.  And then I don't know how long from the time that I was looking at him, he took and killed Tulson.  But he had a gun and he shot him right here.

Q. So long story short, the gentleman who set the bottle down went into the store and eventually shot --

A. Uh-huh.

ROA.9179-9181.

_____

[11] ROA.11528.

25

Counsel then addressed the offense report notation that "Johnson states the suspect did not pick up the glass bottle but stood over it when he urinated against the convenience store." ROA.1465. Johnson confirmed this at the hearing, stating the shooter set the bottle down and never picked it back up:

Q. All right, Ms. Johnson. Just to clarify, did you ever see the shooter take a drink out of the bottle?

A. Yes.

Q. Okay. And that was prior to setting the bottle down?

A. Yes.

Q. Where was this bottle set down?

A. It was set down on the corner of this bench.

. . .

Q. Okay. Did you tell the police about the bottle being set down on the bench?

A. Yes.

Q. Did you ever see the shooter pick the bottle back up?

A. No.

Q. Did you ever tell the police that the shooter had not touched the bottle?

A. No.

Q. Why is that?

A. They didn't ask me.

Q. Okay.  But also you know he didn't touch that bottle, right?

A. Yes.

ROA.9183-9184.  This final question is likely the one the TCCA and district court seize upon to claim Johnson was equivocal – while disregarding the full context of her testimony.  In reality, Johnson consistently stated that she saw the shooter place the bottle on the rail and never saw him pick it back up.

For clarity, additional questions were posed to Johnson on redirect examination.  She reaffirmed that she "wouldn't forget that part" about the bottle. ROA.9198.  She confirmed that she told police about the shooter setting down the bottle (consistent with the original offense report), and – consistent with Investigator Hoffmaster's testimony – acknowledged that she did not type her own written statement.  *Id.*  Finally, undersigned counsel clarified Ms. Johnson's testimony one more time:

Q. How sure are you that the shooter set that bottle down?

A. I'm so sure.  I would put my life on it.

ROA.10674.  The state district court specifically found Ms. Johnson was credible. ROA.12634

Rebecca Green, a Senior Latent Print Examiner at the Houston Forensic Science Center, conducted the 2017 fingerprint analysis. ROA.8674-8787. She tested the "40-once Schlitz Malt Liquor bottle recovered on the metal rail outside beside store," and identified a fingerprint match to Marshall Knight using the FBI database. ROA.8710. A separate print from another beer can matched eyewitness Douglas. ROA.8714. None of the prints matched Hamilton. ROA.8719. Although Green saw no record that the prints had been previously tested, she testified that she always documents comparisons, including exclusions. ROA.8721, 8767.

Debbie Benningfield, a longtime member of HPD's fingerprint section and former AFIS manager, testified that anyone arrested for a jailable offense had their prints entered into AFIS. ROA.8846-8857. She collected the evidence and fingerprints at the Holman murder scene, made final decisions on what to collect, and prioritized items she believed were important or impactful. ROA.8864-8876.

Benningfield testified that, under HPD policy at the time of Huynh's murder, fingerprint exclusions were not documented. A supplemental offense report was only made if usable prints were found and matched a suspect—not if a suspect was excluded. ROA.8878–8880. This applied in Hamilton's case. From reviewing the envelope containing the 40-ounce bottle prints, Benningfield confirmed she compared the prints to both Hamilton and Shawon Smith before trial and excluded

them. No report was made because there was no match. She also compared prints from two other suspects and excluded them as well (these alternative suspects were also never revealed to the defense). Hamilton and Smith were excluded from all other suitable prints at the scene. ROA.8880–8903.

The fingerprint exclusions would have been communicated to the requesting officer but omitted from the offense report. Prosecutors could call Benningfield directly for results, but defense attorneys were referred to HPD legal. ROA.9017-9020.

Dr. Trent Terrell, a cognitive psychologist and expert for Hamilton, raised concerns about the reliability of the eyewitness identifications. ROA.9079-9096. First, he noted that three days passed between the shooting and when Douglas helped create a police sketch—enough time to distort memory. ROA.9103–9104. Second, police gave Douglas and Johnson copies of the sketch, which likely replaced their original memories. Dr. Terrell raised concern they later picked Hamilton from a lineup not because he resembled the shooter, but because he resembled the sketch. ROA.9104–9107.

The evidentiary hearing revealed a significant dispute over the interpretation of DNA evidence from the mouth of the 40-ounce beer bottle and the swabs from

beneath Mr. Huynh's fingernails. Jessica Powers, a forensic analyst with the Houston Forensic Science Center, testified there was insufficient data for comparison. In contrast, defense expert Dr. Collins—qualified as a DNA expert—disagreed. ROA.9226-9245. He concluded the DNA on the beer bottle came from a single individual, excluding Mr. Hamilton. ROA.9226–9266. Regarding the fingernail scrapings, Dr. Collins found a two-person mixture with Huynh as the major contributor and again excluded Hamilton as a source. ROA.9254-9266. Although the lab had not compared the sample to Hamilton's, Dr. Collins testified this was based on speculation of additional contributors, unsupported by firm evidence. ROA.9266–9270.

Powers ultimately agreed that, assuming a single DNA profile on the bottle or a two-person mixture under the fingernails, Hamilton would be excluded. ROA.9591, 9595. She did not challenge Dr. Collins's conclusions as unsupported, only describing them as more "aggressive than we're willing to do in our lab." ROA.9597.

The trial prosecutors knowingly misled the Court by claiming Mr. Hamilton's fingerprints were not excluded from the Holman murder scene. Longtime District Attorney investigator Buddy Berringer testified that, before trial, prosecutor Barnett directed him to determine whether Hamilton's fingerprints matched any collected at

the scene. Berringer contacted the lab, confirmed that Hamilton was excluded from all prints, documented the findings in a memorandum, and gave it to Barnett. He affirmed that Barnett was aware of Hamilton's elimination. ROA.9255.

Loretta Muldrow, Hamilton's lead trial counsel, testified that she was never informed Hamilton had been excluded from all fingerprints found at the scene – and was unaware any comparisons had been conducted. ROA.9356. Muldrow explained that under the District Attorney's "open file" policy, defense counsel relied on the integrity of individuals prosecutors to disclose all relevant information, as they controlled the contents of the file. ROA.9335-9340, 9362.

Muldrow testified that, following Hamilton's guilty plea in the Yellowstone case, the Holman murder became the central focus. ROA.9344. Had she known that both Hamilton and Smith were compared and excluded from all fingerprints at the scene – including those on the bottle the shooter put down – her defense strategy would have changed. She would have called her own fingerprint expert and she would have questioned Investigator Park differently. ROA.9357-9365. She noted that, based on the prosecutor's pre-trial statements concerning the lack of forensic testing, she knew she could ask Investigator Park about the prints not tying to back to Hamilton or Smith – believing there was no fingerprint evidence linking either man to the scene – not that they were excluded – and she was clear that her defense

31

of Holman murder was severely undermined based on the prosecution's suppression of the fingerprint evidence. *Id.*

Unaware of the suppressed fingerprint evidence, Muldrow's trial strategy regarding the Holman murder was to rely heavily on co-defendant Shawon Smith, who had entered a plea deal in exchange for truthful testimony. She expected Smith to testify that his car—allegedly used in the Holman murder—was in an impound lot on December 8, 2001, making its use impossible. He also would have testified that, as Hamilton's best friend, he would have learned if Hamilton had committed the crime. But when the defense announced their intent to call Smith, prosecutors falsely claimed uncertainty about his plea deal, prompting Smith's attorney to invoke the Fifth Amendment. Both Muldrow and Smith's attorney testified that prosecution's reasoning for pulling the plea deal was false, and that no investigation occurred before Smith was re-offered the same deal—after Hamilton's trial ended. ROA.9278-9312, 9345–9355.

The District Attorney's Office presented no evidence rebutting that prosecutors suppressed the fingerprint evidence before and during trial. While the prosecutors documented numerous other disclosures to the defense, there is no record that the fingerprint comparisons were disclosed – and trial prosecutors made

direct false statements to the trial court that there were no fingerprint comparisons in this case. ROA.3110, 11465-11485.

Finally, Marshall Knight, whose fingerprints were on the 40-ounce beer bottle the shooter was seen handling just before the murder – was called to testify. Knight, through counsel, invoked his right to remain silent and refused to answer any questions about the bottle, the crime scene, or the shooting. ROA.9322-9324.

## VII. THE TRIAL COURT RECOMMENDS A NEW PUNISHMENT HEARING, THE CCA DENIES RELIEF.

After presiding over a live evidentiary hearing, the trial court found that Hamilton met his burden of proving both his Eighth Amendment and Due Process claims based on the use of false evidence at trial. It further held that the State violated Hamilton's right to due process by suppressing exculpatory fingerprint evidence. ROA.12623-12624. The court concluded that the Holman murderer handled the 40-ounce Schlitz malt liquor bottle, that the fingerprint evidence was more reliable than the belated witness identifications, and that Hamilton proved the false evidence claims by clear and convincing evidence. ROA.12677. The court also found that police and prosecutors actively suppressed material fingerprint evidence in violation of *Brady*, and that Hamilton had proven that claim. ROA.12679-12685.

The TCCA denied relief in a brief order.  ROA.8625-8631.  Despite the jury never learning that the Holman shooter sat down the relevant 40-ounce bottle, the Court found that "the State's trial evidence about the fingerprints was consistent with the fingerprint evidence developed at the habeas stage." *Id.* at 4.  The entirety of the false evidence claim was denied because, according to the TCCA, "[t]he jury heard the "essence" of the habeas evidence — that the prints on the bottle were not applicant's or Smith's. . ." *Id.* at 8629.  And the *Brady* claim was apparently denied based on the materiality prong:

> No one identified the bottle in question as having been handled by the shooter.  And the witness who testified in the habeas hearing that the shooter handled a bottle just before the shooting equivocated about that assertion.

*Id.* at 5-6.

## SUMMARY OF THE ARGUMENT

A certificate of appealability should issue on Hamilton's claim that his death sentence violates the Eighth Amendment's ban on cruel and unusual punishment because it was predicated on materially false evidence—namely, his alleged involvement in an extraneous capital murder.

Eyewitness Wanda Johnson saw the shooter in the Hollman murder drink from a 40-ounce beer bottle and place it on a metal rail outside the store just before the crime. Police collected the bottle that night, and contemporaneous reports confirm Johnson's account. In 2017, fingerprint and DNA testing excluded Hamilton as a contributor, and identified another man, Marshall Knight—who had prior convictions for aggravated robbery and weapons charges. Knight, who matched the shooter's description, refused to testify and invoked the Fifth Amendment.

The only evidence linking Hamilton to the extraneous murder came from disputed eyewitness identifications, the testimony of jailhouse informant Joseph Montoyer—whose extensive criminal history and conflicting accounts were never revealed to the jury—and superficial similarities between the two crimes. Despite its unreliability, the State heavily relied on this evidence to secure a death sentence. The

forensic evidence now proves that connection was materially false and points to Knight.

A certificate should also issue on Hamilton's Fourteenth Amendment due process claim: the State suppressed exculpatory evidence. Police had tested the fingerprints before trial and knew Hamilton and co-defendant Shawon Smith were excluded. Despite a court order requiring disclosure of fingerprint evidence, prosecutors falsely claimed no comparisons had been made. A DA's office memo—unearthed 17 years later—confirms they knew Hamilton was excluded from the prints on the bottle. HPD had a policy of not documenting exclusions in police reports, compounding the concealment.

A certificate is also warranted on Hamilton's Sixth Amendment ineffective assistance of counsel claim. Trial counsel failed to object to inadmissible bad-act evidence, inadequately cross-examined Montoyer, and neglected to present critical exculpatory evidence. Her deficient performance prejudiced Hamilton.

Finally, a certificate should issue on Hamilton's Sixth Amendment conflict-of-interest claim. His attorney, Muldrow, briefly represented Montoyer in the very case for which Montoyer received a benefit for providing evidence against Hamilton.

Muldrow admitted this conflict impaired her ability to cross-examine Montoyer, resulting in adverse consequences for Hamilton.

Hamilton raised these claims in the district court and made a substantial showing of constitutional violations. Reasonable jurists could disagree with the district court's resolution of both the merits and the procedural grounds and could find the claims deserving of further review. Hamilton respectfully requests that this Court grant a certificate of appealability on each claim.

## STANDARD OF REVIEW

A state prisoner whose petition for a writ of habeas corpus is denied by a district court must obtain a certificate of appealability (COA) prior to taking an appeal. *Buck v. Davis*, 137 S. Ct. 759, 773 (2017); 28 U.S.C.A. § 2253. "A COA may issue 'only if the applicant has made a substantial showing of the denial of a constitutional right.'" *Id.* The Supreme Court explains:

> [T]he only question is whether the applicant has shown that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." This threshold question should be decided without "full consideration of the factual or legal bases adduced in support of the claims."

*Id.* (internal citations removed). When an issue is denied on a procedural ground, the petitioner must show the debatably valid constitutional claim and that "jurists of

reason would find it debatable whether the district court was correct in its procedural ruling." *Tong v. Lumpkin*, 90 F.4th 857, 862 (5th Cir. 2024). "Any doubts as to whether a COA should issue must be resolved' in the petitioner's favor." *Young v. Davis*, 835 F.3d 520, 523–24 (5th Cir. 2016). This Court reviews *de novo* questions of law and mixed questions of law and fact. *See Carty v. Thaler*, 583 F.3d 244, 252–53 (5th Cir. 2009).

## ARGUMENT

**I.    A CERTIFICATE OF APPEALABILITY SHOULD ISSUE FOR HAMILTON'S CLAIM THAT THE EIGHTH AMENDMENT'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT WAS VIOLATED BY A DEATH SENTENCE GROUNDED UPON EVIDENCE THAT HAS BEEN REVEALED TO BE MATERIALLY INACCURATE.**

After presiding over the state post-conviction hearing, the State District Court Judge found that Hamilton's Eighth Amendment right was violated "because his death sentence was obtained upon the use of materially inaccurate evidence." ROA.12666. The State District Court found "any and all evidence presented at the original trial that Hamilton committed the extraneous Holman murder" was materially inaccurate. *Id.* This finding was based on the "firmly established evidence showing that the perpetrator of the Holman Murder held, drank out of, and set down a particular 40-ounce beer bottle on a rail outside of the store immediately prior to committing the murder - and that forensic testing on this bottle excludes

Hamilton and inculpates another individual, Marshall Knight, in the Holman Murder." ROA.12667.

Unlike the TCCA and the U.S. District Court below,[12] the State District Court considered the totality of the evidence showing that: the Holman shooter touched the 40-ounce bottle, Hamilton's fingerprints are excluded from this bottle, Marshall Knight's fingerprints are on the bottle, Hamilton is excluded from contributing DNA to both the bottle and underneath Huynh's fingernails, flaws with the initial eye-witness descriptions, and Marshall Knight's invocation of the Fifth Amendment. ROA.12666-12674.

In *Johnson v. Mississippi*, the Supreme Court held that the Eighth Amendment is violated when "the jury [is] allowed to consider evidence that has been revealed to be materially inaccurate." *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988).[13] In *Johnson,* the Court noted the familiar refrain that "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual

---

[12] The district court's resolution of this claim is found at ROA.2428-2433.

[13] "When this Court relies on a legal rule or principle to decide a case, that principle is a 'holding' of the Court for purposes of AEDPA." *Andrew v. White*, 145 S. Ct. 75, 81 (2025).

punishment gives rise to a special 'need for reliability in the determination that death is the appropriate punishment' in any capital case." *Id.* at 584. There, the jury was permitted to consider an aggravating factor related to Johnson's prior conviction from New York, and after weighing the evidence sentenced Johnson to death. *Id.* at 582-583. However, years after his conviction, Johnson's prior New York conviction was set aside, and he filed a post-conviction request for relief which was denied by the Mississippi Supreme Court. The Court was tasked with deciding "whether the state court was correct in concluding that the reversal of the New York conviction did not affect the validity of a death sentence based on that conviction." *Id.* at 580.

The Court noted that (much like in Hamilton's case) the prosecution "repeatedly referred to that evidence in the sentencing hearing, stating in so many words: 'I say that [death is proper] because of having been convicted of second degree assault with intent to commit first degree rape and capital murder that Samuel Johnson should die.'"[14] *Id.* at 581. "Even without that express argument, there would be a possibility that the jury's belief that petitioner had been convicted of a

---

[14] The prosecution in Hamilton's case made similar statements: ""Even, ladies and gentlemen, without that second capital, he is a future danger; but, with it, he is an absolute menace," "[Hamilton] will just go in there and kill the clerk a second time," "[T]here is not a thing that you can do to him that is as horrible as what he did to Mr. (Huynh)." *See* Appendix B at 7.

prior felony would be 'decisive' in the 'choice between a life sentence and a death sentence.'" *Id.* at 586. In the end, the Court found that a new sentencing proceeding was required because "the jury was allowed to consider evidence that has been revealed to be materially inaccurate." *Id.* at 590.

The district court claims that this Court has "been skeptical about whether an inmate may base a false-evidence claim on *Johnson*" based on this Court's opinion in *Hernandez v. Johnson,* 213 F.3d 243, 252 (5th Cir. 2000). This is incorrect, in *Hernandez,* this Court applied *Johnson's* materially inaccurate evidence framework to purported false testimony, and denied the claim on the merits. *Id.* at 252-53.

A debatable legal conclusion from the district court, apparently relied upon by the TCCA, is that the presentation of a false and misleading evidence concerning an extraneous murder cannot be the basis of relief unless a capital petitioner can prove "specific testimony or evidence . . . was false or inaccurate." ROA.27.[15] The district court held "[w]hile Hamilton's more-recent testing could raise questions about his guilt for the Holman murder, he has not shown that any trial testimony or evidence was false." ROA.2430. Would our Constitution really permit the

---

[15] "Forcing an actual-innocence claim into other packaging does not create a constitutional basis for relief." *Id.*

41

execution of man falsely accused of an extraneous murder during the punishment phase of his trial simply because the newly discovered exculpatory evidence does not directly contradict witness testimony? The Supreme Court's admonition that the Eighth Amendment is violated when "the jury was allowed to consider evidence that has been revealed to be materially inaccurate" suggests otherwise and shows that the TCCA's denial, and the district court's decision, were both based on an unreasonable application of Supreme Court precedent. *Johnson,* 486 U.S. at 590; 28 U.S.C. § 2254 (d)(1). Indeed, Johnson's death sentence violated the Eighth Amendment despite that, at the time of his trial, he had been convicted of a prior violent felony in New York. Of course, the idea that Hamilton committed a second murder has always been false.

Another error in the district court's AEDPA analysis is its support of the TCCA's holding that Hamilton "fail[ed] to show that this bottle or the print recovered from it is material to the identity of the Holman shooter." ROA.2423 (citing ROA.8629). This is an unreasonable application of *Johnson* because *Johnson* instructs that courts must consider the evidence developed after trial in deciding whether materially inaccurate evidence prejudicing a capital defendant was

presented at trial.[16]  And Hamilton established that witness Johnson told detectives, the day after the shooting, that shooter sat down a 40-ounce bottle on the rail outside the Hollman store, only one 40-ounce bottle was found outside the store (and where Johnson said it would be), that bottle was collected by police and has Marshall Knight's fingerprints on it, and Johnson remains so sure the shooter touched the bottle she would bet her life on it.  To the extent the TCCA's factual finding should be reviewed under 28 U.S.C. § 2254 (d)(2), Hamilton has shown it was "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.*

The district court also failed to consider the complete record in deciding that "significant evidence still connected him to the Holman murder." *Id.* at 28.  The court notes that Wanda Johnson and Charles Douglas identified Hamilton as the shooter, but ignores the problems with the picture lineups presented weeks after the shooting to witnesses provided with the police sketch.  The court relied on the testimony of jail-house-informant Montoyer, without discussing that he initially provided information in exchange for lowering his bond, that his story had changed,

---

[16] The TCCA also stated "[n]o one identified the bottle in question as having been handled by the shooter."

or that Hamilton's conflicted trial counsel failed to bring out five of his seven prior convictions.

Nor does the district court explain why it considers exculpatory evidence piece-by-piece, rather than cumulatively. ROA.2431-2433. For example, the court completely discounted that Hamilton was excluded from the DNA evidence collected from the mouth of the 40-ounce bottle and under Mr. Hyunh's fingernails because there was no DNA evidence at trial. This analysis misapplies the holding in *Johnson*. There, at the time of trial, Johnson "had been 'previously convicted of a felony involving the use or threat of violence to the person of another'" and after trial his conviction was reversed. *See Johnson*, 486 U.S. at 582-83. Despite that the conviction was valid at the time of trial, the Supreme Court ordered a new sentencing proceeding because Johnson's sentence was "based in part on a reversed conviction. . ." *Id.* at 585. Johnson stands for the proposition that a death sentence cannot stand if it was based on materially inaccurate information, even if the inaccuracy was not revealed until after trial.

The district court is correct that Hamilton argues the evidence presented at trial tending to show he committed the Holman murder was false. He argues that the state district court, which conducted the evidentiary hearing, was correct in deciding that "Hamilton has proven his false and misleading evidence claim by clear

44

and convincing evidence." ROA.12677. He argues that, at a minimum, jurists of reason can dispute the ruling of the district court and the issue presented is adequate to deserve encouragement to proceed further. A COA should issue for the Eighth Amendment claim.

## II. A CERTIFICATE OF APPEALABILITY SHOULD ISSUE FOR HAMILTON'S CLAIM THE TRIAL PROSECUTORS DENIED MR. HAMILTON DUE PROCESS BY SUPPRESSING EXCULPATORY FINGERPRINT COMPARISON RESULTS RELEVANT TO THE EXTRANEOUS CAPITAL MURDER.[17]

The state district court found the prosecution had violated *Brady* by failing to disclose the fingerprint comparison results. ROA.12679-12686. The TCCA denied relief, apparently finding the suppressed evidence was not material.[18] In reaching this conclusion the TCCA unreasonably applied clearly established federal law.

In *Brady v. Maryland,* the Court held that the State's failure to disclose evidence favorable to the defendant "violates due process where the evidence is material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87

---

[17] This issue involves a mixed question of law and fact, and this Court reviews the district court's decision *de novo*. *Floyd v. Vannoy*, 894 F.3d 143, 160 (5th Cir. 2018). AEDPA review is under 28 U.S.C. § 2254 (d)(1). *Id.*

[18] "No one identified the bottle in question as having been handled by the shooter. And the witness who testified in the habeas hearing that the shooter handled a bottle just before the shooting equivocated about that assertion." ROA.8629-8630.

(1963).  Although the government must disclose favorable evidence absent any specific request from the defense, "[w]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *United States v. Agurs*, 427 U.S. 97, 106 (1976).

The three components of a due-process violation under Brady are well-settled: (1) the evidence at issue must be favorable to the defendant; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) the evidence must be material.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Evidence is material if there is "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009).

The district court and TCCA appear to accept that the fingerprint comparison results were favorable evidence.  This is supported by the opinion in *Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018).  There, this Court noted that "[t]he presence of a third party's fingerprints at a crime scene does not itself prove [the Defendant] was not present; but, it is evidence that a third party, not Floyd, touched an item that was singled out for dusting by investigators and linked to the commission of the crime through Detective Dillmann's testimony."  *Id.* at 164.  The evidence is even more favorable in Hamilton's case, where an eyewitness told police the day

46

following the murder that the shooter touched the 40-ounce bottle just prior to killing Mr. Huynh.

Unlike the TCCA, the District Court found that the fingerprint comparison evidence *was* turned over at trial – during the testimony of Officer Park "the fingerprint evidence did not 'tie back' to Hamilton and his co-defendant Smith." ROA.2424. As support for its argument that the "tie back" question informed the parties and jurors that the fingerprints found on the bottle were actually compared to Hamilton and Smith, the district court notes that trial counsel did not appear surprised by Park's testimony or move for a continuance. ROA.2425. This is an unreasonable finding, as the record supports that trial counsel believed there had been no fingerprint comparisons in this case, and for this reason knew she could safely ask the "tie back" question.

During pretrial proceeding the prosecutors were asked if they had any "scientific test like . . . *fingerprint comparisons* . . .?" ROA.3110 (*emphasis added*). One prosecutor answered "no." *Id.* The prosecution had previously been ordered to turn over the results of fingerprint examinations. ROA.3109. These matters applied to both the offense of conviction and the extraneous Holman murder. ROA.3115-3116.

Defense counsel Muldrow testified credibly before the state court. ROA.12654. She explained that prior to trial she never learned there had been any print comparisons. ROA.9356-9357. Ms. Muldrow's testimony matches the trial record because the prosecutors denied the existence of any fingerprint comparison evidence prior to trial.

The false assertion about the lack of comparison results also explains Ms. Muldrow's cross examination of Officer Park. Ms. Muldrow explained she knew she would be able to get away with asking Park about the fingerprint evidence at trial:

> I presumed. Since the answer at the hearing about disclosing scientific results, including fingerprints was no . . . Then that would be no connection to Ronald James Hamilton, Junior and Shawon D. Smith.

ROA.9365. The exact exchange at trial was:

[Counsel:] Did you collect that bottle?

[Park:] Yes, we did. Our latent lab examiner did.

[Counsel:] And any prints on the bottle?

[Park:] Yes.

[Counsel:] Okay. Did it tie back to my client?

[Park:] No.

[Counsel] Did it tie up to Mr. Smith, Shawn Smith?

48

[Park:] No.

[Counsel] Okay. Any physical evidence that came back to my client or to Shawn Smith?

[Park:] No, not in this investigation.

18 RR 40–41. Ms. Muldrow knew she could not hurt her client by asking these questions because she had been told there were no fingerprint comparisons in either case, at most Officer Park would relate that fact to the jury.

The response from Officer Park could have been interpreted by the jury as showing that (1) prints at the scene were compared to Hamilton's and Smith's and the men were excluded, or (2) that no comparisons were attempted. Park's testimony, when coupled with the prosecution's statement during closing argument that "there weren't any prints found at either scene[,]" likely led the jury to believe there were simply no prints compared in the case. ROA.6681. Indeed, that Park's testimony was most likely interpreted as a complete lack of comparisons taking place is supported by the State's briefing before the state courts, where, after reading Park's testimony, the State repeatedly argued there had never been fingerprint

comparison prior to 2017.  *See Supra*.  The district court's holding that the results of

testing were disclosed through Park's testimony is simply incorrect.[19]

Jurist of reason can also debate the district court's ruling related to materiality.

The relevant question is whether there is "a reasonable probability that at least one

juror would have struck a different balance" had the fingerprint evidence not been

suppressed.  *Andrus v. Tex.*, 140 S. Ct. 1875, 1886 (2020).[20]  Indeed, the district

court ruled against Hamilton, while at the same time recognizing that "[t]he defense

may have used that information to put reasonable doubt in jurors' minds, and could

have strengthened that argument had trial counsel questioned Johnson about whether

the shooter touched the bottle."  ROA.2427.  Of course, if the jurors had a reasonable

doubt about who committed the Holman murder, then they could not consider the

Holman evidence at punishment.  ROA.2956 (jury instruction).

The TCAA, and to a lesser extent the district court, also failed to consider how

a timely disclosure of the fingerprint comparison results could have affected the

---

[19]  The district court also claims that defense "counsel argued in closing arguments that no fingerprint evidence connected Hamilton to the crime." ROA.2425 (*citing* Dkt. 25-33 at 45). Defense counsel actually stated there were "no prints." ROA.6704. This is further proof the defense did not believe fingerprints were compared to Hamilton's.

[20] *See also Kyles*, 514 U.S. at 436 (equating the IAC prejudice test with the *Brady* materiality test).

defense's case. Both courts should have considered whether "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." *Kyles v. Whitley*, 514 U.S. 419, 441 (1995).[21]  In *Kyles,* the Court specifically discussed the ways in which trial counsel might have used the suppressed evidence. *Id.* at 446.  And in Hamilton's case, this would have included proving through Wanda Johnson that the shooter sat the bottle down just before killing Mr. Huynh, and proving that Hamilton's fingerprints were not on the bottle, but that another person's prints were on the bottle – all facts the jury never learned. *See also U.S. v. Bagley,* 473 U.S. 667, 682-83 (1985) (explaining the reviewing court must consider how the non-disclosure affected the trial process.).

Finally, the TCCA and the district court misapplied Supreme Court Precedent by relying on "various reasons why the jury might have discounted" Ms. Johnson statements. *Smith v. Cain,* 565 U.S. 73, 76 (2012).  This "argument offers a reason that the jury *could* have disbelieved [Ms. Johnson's] statements, but gives us no

---

[21] The district court's materiality analysis appears to have required Hamilton to prove the error was harmful, this is incorrect. "In effect, this materiality standard requires the beneficiary of [the] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Glossip v. Oklahoma*, 145 S. Ct. 612, 627 (2025) (internal citation omitted).

confidence that it *would* have done so." *Id.* Rather than casting its own credibility judgment for the jury, the TCCA should have considered whether there was a reasonable possibility that one juror might have changed her punishment decision had the jury learned the shooter had touched the bottle just before committing the murder, and that Hamilton was excluding from leaving the fingerprints on that bottle.

This Court's decision in *Floyd v. Vannoy* supports Hamilton's argument. 894 F.3d 143 (5th Cir. 2018). Floyd, like Hamilton, had been arrested for two murders, and convicted for one of the murders. *Id.* at 148-149. The murders were committed against gay men in a similar fashion and just days apart, and Floyd's statements made at a New Orleans bar made him a suspect. *Id.* at 150. He confessed to both murders. *Id.* at 150.[22] Like Hamilton's case, "the State did not present any physical evidence linking Floyd to Hine's murder." *Id.* at 151. Floyd was convicted of the Hines murder, but simultaneously acquitted of the second charged murder.

---

[22] Interestingly, mistaken eyewitness identification and false confessions play a role in the majority of convictions overturned based on new DNA evidence. *See https://www.floridainnocence.org/contributing-factors.*

Like Hamilton, Floyd's post-conviction lawyers discovered evidence not disclosed prior to trial, including fingerprint evidence excluding Floyd and post-conviction DNA-test results showing hairs found at the scene did not come from Floyd. *Id.* at 152. The new evidence also included witness statements not previously disclosed and evidence of Floyd's susceptibility to giving a false confession. *Id.*

After finding "no reasonable theory to support the conclusion that the evidence at issue was properly disclosed[,]" the Court discussed favorability. *Id.* at 162. "As for *Brady*'s favorability prong, it would be an unreasonable application of *Brady* and its progeny to conclude that the withheld evidence was not favorable." *Id.* at 163. The Court, unlike the TCCA and district court, recognized that favorability is not a function of the evidence presented at trial: "[T]he character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record." *Id.* In addition to discussing the impeachment value of the fingerprint evidence (in Hamilton's case, the evidence would counter the eyewitness identification evidence), the Court noted that "[t]he presence of a third party's fingerprints at a crime scene does not itself prove Floyd was not present; but, it is evidence that a third party, not Floyd, touched an item that was singled out for dusting by investigators and linked to the commission of the crime through Detective Dillmann's testimony." *Id.* This argument is stronger in Hamilton's case, where a

key eyewitness, Wanda Johnson, saw the real shooter set the 40-ounce malt liquor bottle on the rail just prior to shooting Mr. Huynh.

The Court's discussion of materiality highlights the strength of fingerprint evidence, and shows that habeas courts must consider the strength of the *potential* defense case absent suppression. [T]he "fingerprint-comparison results undermine Floyd's confessions to each murder, and impeach Detective Dillmann's testimony for the Hines murder that the 'glasses filled with a liquid' (in fact, discovered in Hines' bedroom and kitchen) corroborated Floyd's confession." *Id.* at 165-66. The suppressed fingerprint evidence in Hamilton's case undermines the eyewitness identifications, because Wanda Johnson saw the shooter sit the bottle on the metal rail before entering the store to shoot Mr. Huynh. Indeed, they exculpatory value of the fingerprint evidence is much stronger in Hamilton's case, because in *Floyd* there were no witnesses to explain the value of the fingerprint comparison evidence. Further, the existence of fingerprint evidence on the bottle itself contradicted the state's repeated assertions that Yellowstone murder and the Holman murder were similar and would have allowed the defense to rebut the false rhetorical question posed to the jury by the prosecutors: "[i]s it just a coincidence that there weren't any prints found at either scene?" ROA.6681.

Hamilton understands that the Holman murder was not the only extraneous bad act evidence introduced against him at trial, but it was certainly the strongest evidence calling for a sentence of death. [23] The State called nine witnesses to prove he had committed the crime, while at the same time suppressing the strongest evidence that he was not involved. Before Hamilton could be sentenced to death, the jury had to find more than he was likely to commit criminal acts of violence that would constitute a continuing threat to society. ROA.2964. Considering all of the evidence, including the commission of the Holman murder, the jury also had to consider whether there were sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed. *Id.* And, despite their lacking mitigation investigation, Hamilton's youth was so horrendous that his defense team put on a fledgling, but compelling, mitigation case.

Hamilton argues that there is a reasonable probability that had the fingerprint exclusions been disclosed at least one juror would have opted for a sentence of life in prison. This Court should grant a COA for this issue.

---

[23] Of course, as discussed *infra*, many of the other extraneous bad acts would not have been admissible had trial counsel objected to lack of notice.

III. **A CERTIFICATE OF APPEALABILITY SHOULD ISSUE FOR HAMILTON'S CLAIM HE RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL DURING THE PUNISHMENT PHASE OF HIS TRIAL.**

Hamilton argues that defense counsel provided ineffective assistance of counsel during the punishment phase of his trial. Trial counsel failed to object to numerous inadmissible and extraneous bad acts, failed to effectively cross-examine a prosecution witness connecting Hamilton to the Holman murder, and failed to highlight key exculpatory evidence from the Holman crime scene. These claims and their factual basis were presented to the state courts in Hamilton's subsequent state habeas application, are therefore exhausted, but were procedurally defaulted because the TCCA held they could not be presented in a subsequent proceeding. *Ex parte Hamilton*, 2020 WL 6588560, at *3 (Tex. Crim. App. 2020).[24]

---

[24] After *Shinn v. Ramirez,* 596 U.S. 366 (2022), there is an open question in this district concerning a federal court's consideration of evidence presented to state courts for a claim the state court found procedurally defaulted. *See Cole v. Lumpkin*, 2022 WL 3710723, at *5 (5th Cir. 2022) (UNPUBLISHED) (discussing, but not resolving the issue); *cf. Brewer v. Lumpkin,* 66 F.4th 558, 567 (5th Cir. 2023) (six new declarations, apparently never submitted before the state courts, barred from consideration under *Shinn*). Hamilton argues that all of his evidence was submitted to Texas courts during his subsequent proceedings, and therefore *Shinn* does not apply. The district court disagreed, citing *Tong v. Lumpkin,* 90 F.4th 857, 866-67 (5th Cir. 2024). ROA.2436. But Tong is different, there the evidence in question had never been submitted to the district court. *Tong,* 90 F.4th at 862-867.

The legal framework is well established. In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court held that a claim of ineffective assistance of counsel requires a defendant to show that: (1) counsel's performance was deficient, meaning that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defendant by depriving him of "a trial whose result is reliable." *Id.* at 687. "To show deficiency, a defendant must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Andrus v. Tex.*, 140 S. Ct. 1875, 1881 (2020) (*citing Strickland*). And to establish prejudice, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "And because [a Texas] death sentence required a unanimous jury recommendation, prejudice here requires only 'a reasonable probability that at least one juror would have struck a different balance' regarding [special issues.]'" *Id.* at 1886 (*citations omitted*).

Hamilton recognizes that the complete legal and factual basis of these claims was been presented to the state courts, but that they were procedurally defaulted.

"[A] procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (U.S. 2013) (citing *Martinez v. Ryan*, 132 S. Ct. 1309, 1320, 182 L. Ed. 2d 272 (2012)). "To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez,* 132 S. Ct. at 1318.[25]

Because the district court's review under *Martinez* was based on the underlying merits of these claims, Hamilton will explain why jurist of reasons can debate the court's merits determinations.  ROA.2439-2456.

---

[25] The district court stated that "Hamilton does not provide specific briefing showing that each claim is substantial as understood by *Martinez,* that habeas counsel was ineffective as it each ground, and that a reasonable probability exists that the state habeas court would have granted relief on each barred claim." ROA.2438.  Hamilton disagrees, he fully briefed each claim, showing why the each had "some merit," explained that state post-conviction counsel failed to investigate the mitigation case, and faulted state post-conviction counsel for not discovering and litigation meritorious IAC claims.  ROA.1167-1170.

**A. Jurists of reason would debate whether trial counsel repeatedly failed to object to harmful, but inadmissible, extraneous bad act testimony.**

The district court found no material harm from the *Brady* and false evidence claims because the prosecution admitted additional harmful extraneous bad act evidence during the punishment phase. Much of the additional "future dangerousness" evidence would have been inadmissible had trial counsel simply objected. The district court briefly summarized the unnoticed extraneous acts:[26]

- "Hamilton threatened to hurt [his girlfriend] Brooke Rogers if she told on him regarding the Yellowstone murder." (Dkt. 50 at 85)

- "Hamilton having other girlfriends, and having children with those other girlfriends, while dating Brooke Rogers." (Dkt. 50 at 86)

- "Hamilton trying to have sex with Brooke Rogers during a period in which she was dating another man." (Dkt. 50 at 87)

- "Hamilton violently assaulting Brooke Rogers after walking to the transit center and then disappearing with their child." (Dkt. 50 at 88)

- "Hamilton fight[ing] and arguing with Brooke Rogers on several other occasions, including calling her several derogatory names." (Dkt. 50 at 89)

---

[26] *See also* Statement of the Case, Sec. II, C.

- "Hamilton shooting at Brooke Rogers." (Dkt. 50 at 89)

- "Hamilton assaulting Brooke Rogers while she was visiting Hamilton's cousin." (Dkt. 50 at 89)

- "Hamilton making homosexual references about [fellow inmate] Jason Gurley." (Dkt. 50 at 90)

- Testimony from Joseph Montoyer that "Hamilton being a jailhouse bully that picks on Caucasian people, and that he was involved in 3-4 jailhouse fights." (Dkt. 50 at 91)

ROA.37.

In Texas, these prior bad acts were not admissible at the punishment phase of trial unless they were properly noticed. Notice must include the "date on which and the county in which the alleged crime or bad act occurred and the name of the alleged victim of the crime or bad act." *See* Tex. Code Crim. Proc. art. 37.07 sec. (3)(g), 37.071 sec. 2(a)(1).[27]  The district court recognized that proper notice was a

---

[27] The language of section 3(g) is mandatory. If the state fails to give sufficient notice, the extraneous acts are inadmissible. *See Roethel v. State*, 80 S.W.3d 276, 281 (Tex. App.—Austin 2002, no pet.).

requirement for admissibility, and that the trial court signed orders requiring timely notice.  ROA.2439-2440.

However, the district court, possibly because if its misreading of the state record, found "[w]hether or not Hamilton received notice of the State's case is a matter of dispute."  ROA.2441.  At the state hearing, the state attempted to introduce a notice – or note – documenting discovery which had been provided to trial counsel. ROA.9408.  Hamilton objected under the rule of optional completeness, asking to introduce his own exhibit 24, which included all notices the State had provided up that point in the litigation.  *Id.*  But, just prior to evidentiary hearing, the State had produced additional pretrial notices, and both parties agreed Defense 24 should be amended to include all pretrial notices provided by the State.  ROA.9408-9411.  As result, we can rely on Defense 24 as containing all pretrial notices provided to trial counsel.  *See* ROA.11465-11485.  The district court's finding it is "unclear whether the State provided proper notice to the defense" is simply incorrect.  ROA.2441.

The district court's legal conclusion, that there can be a reasonable trial strategy of failing to object to harmful and inadmissible evidence is also debatable, and conflicts with the decisions of this Court and the Texas courts.  ROA.2441-2442. Texas courts recognize that defense counsel has a duty to object to harmful, inadmissible evidence.  *See Thomas v. State*, 923 S.W.2d 611, 613 (Tex. App.—

Houston [1st Dist.] 1995, no pet.) (recognizing this duty and holding trial counsel ineffective for failing to object to inadmissible extraneous offenses); *Glivens v. State*, 918 S.W.2d 30, 32 (Tex.App.—Houston [1ˢᵗ Dist.] 1996, pet. ref'd); *see also Spriggs v. Collins*, 993 F.2d 85, 89-90 (5ᵗʰ Cir. 1993) (holding that trial counsel was deficient for failing to object to inadmissible extraneous offenses in the PSI report). This Court agrees that failing to object to harmful and inadmissible evidence cannot be seen as strategy. *See Lyons v. McCotter*, 770 F.2d 529, 534 (5th Cir. 1985) ("To pass over the admission of prejudicial and arguably inadmissible evidence may be strategic; to pass over the admission of prejudicial and clearly inadmissible evidence, as here, has no strategic value.").

The district court's cited authority is also distinguishable. In *Ex parte Salinas*, the TCCA found that defense counsel's failure to object to a defendant's use of crack was a reasonable strategy because the defense wanted to show the decedents were involved in the drug trade. *Ex parte Salinas*, 664 S.W.3d 894, 916 (Tex. Crim. App. 2022). But there is no possible trial strategy in permitting the state to introduce the harmful extraneous bad acts in this case. Indeed, the district court's own opinion shows the damaging nature of these extraneous acts. The district court found inclusion of false testimony concerning an extraneous murder was not material based on the additional extraneous bad act evidence. Stated another way, the district court

62

found the introduction of this type of evidence supported a sentence of death. ROA.2428 (*Brady* issue not material because of, in part, violences toward Rogers and fighting in prison); ROA.2431 (same for false evidence claim).[28]

Just as the district court's judgment on the false evidence and *Brady* claims shows the prejudice flowing from the failure to object to the unnoticed extraneous bad acts, the prejudice argument highlights the damaging nature of the false extraneous murder admitted during the punishment phase. According to the district court, there was no prejudice because "[t]he evidence considered by the jury strongly proved his guilt for a second robbery/murder." ROA.2443. Can this logic really stand in our constitutional democracy? Can it be that Hamilton cannot prove the materiality of his *Brady* and false evidence claims because his defense counsel also failed to object to inadmissible extraneous bad act evidence, and he cannot show prejudice from his attorney's failures because the prosecution withheld exculpatory evidence and presented false evidence of a second capital murder?

---

[28] The district court also cites *Delacerda v. State,* 2021 WL 2674501, at *38 (Tex. Crim. App. 2021) and *Wilkins v. State,* 2010 WL 4117677, at *9 (Tex. Crim. App. 2010). These cases discuss the non-constitutional harm standard for the improper admission of unnoticed extraneous bad acts on appeal. The have nothing to do with the issue at hand.

Hamilton argues that, at a minimum, a COA should issue because jurist of reason can debate the district court's resolution of this claim.

**B.**    **Jurists of reason would debate whether trial counsel was ineffective for failing to investigate, prepare for, and effectively cross-examine Joseph Montoyer – the "jailhouse snitch" who testified that he overheard Hamilton admit to committing the extraneous capital murder.**

Joseph Montoyer, in addition to testifying about unnoticed extraneous bad acts, claimed to have overheard Hamilton discussing the Holman murder while cutting hair. The district court denied Hamilton relief on his *Brady* and false evidence claims, in part, based on Montoyer's testimony. ROA.2427-2428, 2431.[29] Hamilton alleges that his trial attorney was ineffective for failing to bring out five of Muldrow's seven prior convictions,[30] and failing to impeach Montoyer with his prior statement to police. For her part, during the initial state habeas proceedings, trial counsel swore that she did "not believe [she] brought out his priors and his

---

[29] Before Montoyer's initial testimony the prosecution specifically told defense counsel there had been no "deals cut" with him. ROA.6098. Later, when it was revealed Hamilton's lawyer had represented Mr. Montoyer in his guilty plea, the defense also discovered Montoyer had received a benefit for providing information to the state. ROA.6580. Trial prosecutor Barnett then revealed that she "was involved in the very beginning" and that, based on Montyoer's cooperation, she arranged to have Montoyer's bond lowered. ROA.6581-6582.

[30] During his initial testimony Montoyer claimed his only felony or crime of moral turpitude was the forgery conviction he was currently serving time for. ROA.6113-6114.

motivation to lie as clearly as [she] could have" as a result of her conflict of interest from previously representing Montoyer.  ROA.8400.

Counsel's belief was correct.  During his initial examination, Montoyer testified that he overheard Hamilton talking about the Holman murder while cutting his hair, and that his only prior conviction was the forgery for which he was currently incarcerated.  ROA.6099-6114.  After it was revealed that Defense counsel had previously represented Montoyer and the prosecution gave him a benefit for providing information, he testified again. ROA.6596-6601.  He explained that his bond had been reduced in exchange for giving a statement to Prosecutor Barnett regarding Hamilton.  He also admitted previous convictions for felony possession of marijuana in 1984 and forgery in 1994.  *Id*. at 129.  These two felonies were listed on the indictment for the case Muldrow had participated in.  ROA.1344.

At the time of Hamilton's trial, Montoyer had several convictions for felonies and crimes of moral turpitude.  ROA.1294-1349.  In addition to the two felonies listed above, Montoyer had been convicted of felony possession of a controlled substance in 1999, a felony theft in 1999, a felony forgery in 1997, a felony theft in 1995, and a separate felony forgery from the one elicited above in 1994.  *Id*.  These five separate felony convictions – four involving moral turpitude and all of which impacted Montoyer's credibility as a witness, were never brought out by Muldrow

during her cross-examination. Muldrow also failed to cross-examine Montoyer on his use of a number of aliases, including: Joseph Darrell Metoyer, Joe Montoya, Joseph Montego, and Joseph Marshall. *Id.* Finally, counsel failed to impeach Montoyer's statement that he overheard about the Holman murder while cutting hair. In his recorded interview, he said he learned of the murder while helping Hamilton in the law library. ROA.1352.

The district court denied this claim based on three cases cited for the idea that failures during cross-examination are not permissible grounds for a finding of IAC. ROA.2445. First, the court cited *McFarland v. Lumpkin,* 26 F.4th 314, 321 (5th Cir. 2022), a case which involved one capital trial lawyer who repeatedly slept through trial. *McFarland,* 26 F.4th at 320. There, the cross-examination issue was viewed through the deferential lens of 28 USC § 2254(d), a burden which does not apply to Hamilton if he establishes cause and prejudice related to his procedural default. *Id.* at 321. The district court also relied on *Ford v. Cockrell,* 315 F.Supp.2d 831, 859 (W.D. Tex. 2004), where the petitioner claimed trial counsel was ineffective for his failure to cross-examine two witnesses regarding the reliability of the identifications. *Id.* at 858. But in *Ford,* counsel had the opportunity to ask the relevant questions during a pretrial suppression hearing, and "this wider-ranging cross-examination did not yield particularly helpful testimony for Ford." *Id.* at 859. This analysis is not

applicable to Montoyer's cross, where the omitted facts (multiple crimes of dishonesty and changes in his story) could only have discredited a key punishment witness.

Perhaps the most troubling alleged precedent cited by the district court is: "*Henderson v. Norris,* 118 F.3d 1283, 1287 (8th Cir. 1997) (stating that a claim of deficiency in a trial attorney's cross-examination of 'is not the type of error, if indeed it [is] error at all, that the Sixth Amendment functions to correct')." ROA.2445. The suggestion is that failures in cross-examination *can never* establish IAC. The district court's parenthetical citation to *Henderson* took the language of the case grossly out of context. In context, the Eighth Circuit stated: "Henderson does not specify how counsel should have proceeded, simply describing counsel's performance as 'lame.' Appellant's Brief at 23. This is not the type of error, if indeed it was error at all, that the Sixth Amendment functions to correct." *Id.* at 1287. Hamilton went much further than Henderson by specifically establishing the ways in which his counsel's cross-examination was deficient.

Hamilton also argues counsel's failure prejudiced him. Montoyer's role in the trial was to establish Hamilton's alleged jail house confession to the Holman murder, and to prove he was a danger while incarcerated. This is exactly the type of evidence the district court recognized supported the death sentence, and trial

counsel's failures deprived the jury of key evidence discrediting Montoyer's testimony.

A COA should issue because jurist of reason can debate the district court's resolution of this claim.

### C. Jurists of reason would debate whether, in the alternative to the *Brady* claim, trial counsel was ineffective for failing to establish the shooter touched the bottle.

To be clear, Hamilton believes his defense team did not establish that the Holman shooter touched the 40-ounce bottle prior to killing Mr. Huynh because the trial prosecutors suppressed that the fingerprints found on the bottle had been compared to and excluded from Hamilton's. Believing there were not fingerprint comparisons conducted in this case, defense counsel would not have known the importance of this evidence, and defense counsel testified at the post-conviction hearing that had she learned of the comparison, her trial strategy would have changed. *See* Claims I, II.

Hamilton has argued that the jury did not hear the "essence" of the current evidence, because, even if the "tie back" questions to Officer Park established

Hamilton was compared to and excluded from leaving the prints on the bottle,[31] the jury never learned the bottle had been touched by the Holman shooter. To the extent the tie back evidence should have been interpreted as a comparison and exclusion, defense counsel was ineffective for failing to established the shooter touched the bottle.

According to the Holman offense report:

"Wanda stated that she and Charles were walking to the store and as they approached the store, she saw a guy urinating against the side of the building and a small dark colored car parked on Burkett next to the building. (It was not mentioned in the statement but she also saw the same man sit down an empty 40 ounce beer bottle on the rail that runs along the Burkett side of the store.) Wanda then saw the man get back in the car and talk to the driver before he got out again and went inside the store."

ROA.11425. Later, according to the report, Johnson stated the shooter did not pick the bottle back up: "witness Johnson stated the suspect did not pick up the glass bottle but stood over it when he urinated against the convenience store that night." ROA.11439. One thing is clear, two days after the murder Johnson told the police the shooter touched the bottle, meaning someone else's fingerprints being on the

---

[31] Hamilton continues to argue the "tie back" testimony did not establish that actual comparisons took place, especially considering the State's closing arguments about no fingerprints being present at either scene. The district court found otherwise.

bottle would have been a key piece of exculpatory evidence concerning the Holman murder.

Assuming the district court's interpretation of Officer Park's testimony is correct, and the jury learned Hamilton's fingerprints were compared to excluded from the bottle, trial counsel was ineffective for failing to establish the shooter touched the bottle. The District Court appears to recognize as much in its opinion related to claims one and two. The Court notes the state did not suppress the fact that Johnson told police the shooter handled the bottle, and "nothing prevented the defense from bringing out testimony about the bottle, and particularly when the defense recalled Officer Park after the fingerprint testimony." ROA.2426.

The district court claims "Hamiltan cannot have it both ways. Either counsel should have questioned witnesses about him touching the bottle or the suppression of the fingerprints prevented counsel from asking that question." ROA.2449-2450. This is precisely why Hamilton raises this issue in the alternative – and it is the district court that cannot have it both ways. If Officer Park's testimony established the comparison results, then counsel was ineffective for failing to establish the shooter touched the bottle, and if Park's testimony did not establish the comparison results (meaning the results remained suppressed), then the prosecution violated *Brady*.

The prejudice flowing from counsel's deficient performance is apparent from the district court's ruling on the *Brady* and false evidence claims. The court repeatedly noted the evidentiary value of the comparison results was diminished because the jury never heard of a link between the shooter and bottle. ROA.14, 16-17, 20, 23, 28. And the TCCA denied these claims because "[n]o one identified the bottle in question as having been handled by the shooter." ROA.8629. For this reason, if the jury learned about the comparison results through Officer Park's testimony, trial counsel was ineffective for failing to establish that the shooter touched the bottle. This evidence would have transformed the comparison results from general evidence that Hamilton's prints were not at the scene, to specific evidence of that a different person committed murder. The evidence would have challenged the eye witness identifications, Montoyer's questionable testimony, and the State's claim that these two crimes were similar and committed by the same people.

Jurist of reason can debate the district court's conclusion that "[i]t is not likely that a state habeas court would have granted habeas relief" on this issue, and a COA should issue.

**IV.    A CERTIFICATE OF APPEALABILITY SHOULD ISSUE WITH RESPECT TO HAMILTON'S SIXTH AMENDMENT CLAIM THAT HIS TRIAL COUNSEL LABORED UNDER AN ACTUAL CONFLICT OF INTEREST.**

In his Amended Petition, Hamilton demonstrated that his Sixth Amendment right to the assistance of counsel was violated when trial counsel Loretta Muldrow labored under an actual conflict of interest that adversely affect her performance. As discussed *supra*, Muldrow represented Joseph Montoyer, the jailhouse snitch who testified against Hamilton and received a favorable treatment in a separate case. Muldrow's conflict undermined her cross-examination of Montoyer.

Despite this, the District Court denied relief on procedural and alternative merits grounds and refused a COA. Jurists of reason could disagree with the District Court's resolution of his constitutional claim and would find it debatable whether the district court was correct in its procedural holding. Reasonable jurists could also conclude this presented issue is adequate to deserve encouragement to proceed further.

**A.    Jurists of reason could debate whether trial counsel operated under an actual conflict of interest that adversely affected trial counsel's representation and would disagree with the District Court's determination that Hamilton failed to meet his AEDPA burden.**

Hamilton has made a substantial showing that he was denied his Sixth Amendment right to counsel, where his trial counsel operated under an actual

72

conflict of interest, and that his lawyer's performance was adversely affected as a result.

The Sixth Amendment guarantees the right to actual-conflict-free counsel and the U.S. Supreme Court has consistently held that a lawyer operating under an actual conflict of interest violates this right. *Glasser v. U.S.*, 315 U.S. 60 (1942); *Holloway v. Arkansas*, 435 U.S. 475 (1978); *Cuyler v. Sullivan*, 446 U.S. 336 (1980); *Wood v. Georgia*, 450 U.S. 261 (1981); *Mickens v. Taylor*, 535 U.S. 162 (2002). To establish a violation, a defendant need only show that an actual conflict adversely affected counsel's performance; no showing of prejudice is required. *Sullivan*, 446 U.S. at 348-50.

Actual conflicts may exist when defense counsel is compelled to compromise her duty of loyalty or zealous advocacy by choosing between or blending the divergent or competing interests of a former or current client. *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000). An attorney who cross-examines a former client inherently encounters divided loyalties, because counsel is placed in the position of having to cross-examine his own client as an adverse witness. *Id*. at 801. Her zeal in defense of her client the accused is thus counterposed against solicitude for her client the witness. *Id*. at 802.

In this case, Muldrow was forced to cross-examine her client, Montoyer, whom she represented during a plea hearing at a time when she was also representing Hamilton. These were overlapping representations at that moment, and Hamilton's trial even followed closely after her representation of Montoyer. And Muldrow represented Montoyer on the very case in which he received a deal for giving information against Hamilton.

In representing Hamilton, Muldrow needed to destroy the credibility of her client Montoyer – attacking his character and credibility even with the case she represented him on; pointing out that he lied to the jury (about not having several other prior felony convictions); impeaching him with those several prior felony convictions; impeaching him with his use of multiple aliases and forgery history; establishing that he lied to the jury about his basis of knowledge of Hamilton's alleged jailhouse confession (Montoyer stated in trial he overheard Hamilton confessing to other inmates while Montoyer was cutting hair; in his recorded statement to police, Montoyer claimed the confession occurred while he was helping Hamilton in the law library); object to unnoticed extraneous bad act evidence that Montoyer was permitted to elicit during testimony (allegations of several inadmissible hate-crime type jail assaults). Muldrow was tasked with destroying

one client to the detriment of another client – because Muldrow had a duty not to destroy Montoyer in the above-mentioned ways. This is actual conflict.

Muldrow failed at each of the above, and even recognized in her own affidavit in State habeas proceedings that the revelation of the conflict-issue distracted her during her cross-examination of Montoyer – establishing adverse effect in her performance. Muldrow recognized she failed to bring out Montoyer's priors (he lied and told the jury he only had two felony convictions; he had at least five more – all felonies and crimes of moral turpitude); she recognized she failed to bring out his motivation to lie; and recognized she failed to counter the assertions that Hamilton had any alleged involvement in the Holman murder – critical to her future dangerousness case – and which occurred as a result of her admitted distraction by the conflict issue. This is actual conflict with adverse effect.

In its Memorandum, the district court recognized and deferred to the State habeas court's determinations that Muldrow's representation of Montoyer was "inconsequential and limited," such that "'Muldrow was not required to make a choice between advancing [Hamilton's] interests or the interests of Montoyer to the detriment of' Hamilton;" that the representation had "no adverse effect on her representation of Hamilton;" and that Muldrow's affidavit describing the effect on

her representation as "a speculative and hindsight-based evaluation" because she "had a second opportunity to cross-examine Montoyer."  ROA.2461-2464.

These conclusions – of both the State Court and U.S. District Court – are erroneous and reflect a misapplication, misreading, and narrowing of the actual conflict and adverse effect concepts.

Representation of a defendant during a plea hearing may not be a lengthy representation, but is not limited or inconsequential, and is representation at the most critical stage of the criminal process – particularly when later you become tasked with cross-examining your client about that very case, his massive criminal history, and destroying his credibility to benefit your other client.  This is actual conflict – you have duties to both clients that conflict – and a lawyer is then required advancing interests to the benefit of, or to the detriment of, each client – and you are in the position where you are compelled to make choices between competing interests.

And while the district court reads too narrowly the language of *Perillo* and *U.S. v. Infante*, 404 F.3d. 376, 393 (5th Cir. 2005) – contending that "Hamilton has the burden of showing that there was some plausible alternative defense strategy that could have been pursued, but was not, because of the actual conflict," Hamilton meets this standard, as his trial counsel counsel's alternate defense strategy could

have been to: impeach Montoyer and establish his five felony convictions; to prove

up his aliases and that he even lies about who he is; to prove up his motivation to lie

– and that he did lie – by lying directly to the jury about his criminal history and by

giving conflicting accounts about his entire purported basis for knowledge of the

alleged confession and her alternate defense strategy could have been to object to

the unnoticed extraneous bad acts offered during Montoyer's testimony.  ROA.2463.

*U.S. v. Infante*, 404 F.3d. 376, 393 (5th Cir. 2005) (citing *Perillo* and recognizing

that a defendant 'must generally' establish some plausible alternative defense

strategy that could have been pursued).  These are alternative defensive strategies

that could have been and should have been pursued.  The State habeas court, and the

U.S. District Court in its AEDPA and merits review, ignore and fail to address these

alternatives.

Muldrow recognized that she was distracted during her cross-examination of

Montoyer, and the above-listed failures solidify that contention.  Defense counsel's

distraction by the conflict, and the corresponding failures that occurred as a result of

that distraction, constitute the adverse effect.  In its analysis, the U.S. District Court

ignores Muldrow's distraction at the rise of the conflict problem, and instead too

narrowly concludes regarding her distraction that "it was not because she felt divided

loyalties." ROA.2463. Whatever her feeling regarding loyalty, she herself recognized the conflict issue, and was distracted.

And finally, even though Montoyer was permitted to be recalled for further cross-examination – these issues still were not fixed, nor ameliorated (and could not be ameliorated with respect to the failure to object to the inadmissible bad-act evidence during Montoyer's testimony) and the actual conflict still existed. That it would be thought that Montoyer even needed to be recalled in the first place furthers that there was adverse effect. The State habeas court, and the U.S. District Court in its AEDPA and merits review, ignore and fail to address these alternatives.

Hamilton was entitled to a lawyer who suffered no adverse effect during the performance of cross-examining Montoyer. He did not receive that lawyer or the requisite unaffected performance. Hamilton has substantially shown the denial of his Sixth Amendment right to the assistance of counsel.

The State habeas court's conclusion otherwise was contrary to, or an unreasonable application of, federal law, and to the extent factual findings were made with respect to this claim, those findings resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. And the correctness of the district court's application of

AEDPA, and its merits review, are debatable among jurists of reason and jurists could conclude the issues presented are adequate to deserve encouragement to proceed further. Hamilton requests this Court grant a COA on this claim.

> ### B. Jurists of reason would disagree with the District Court's determination that this claim is procedurally barred.

Reasonable jurists could disagree with the District Court's conclusion that Hamilton's Sixth Amendment conflict-of-interest claim is procedurally barred for not being raised on direct appeal or in a motion for new trial.

Texas does not require Sixth Amendment right-to-counsel claims to be raised on direct appeal or in a motion for new trial. Such claims—including conflict-of-interest claims, which the district court recognized as a "species of ineffective-assistance claim"—may be properly brought in a state habeas petition. ROA.2469. *see also Cuyler v. Sullivan*, 446 U.S. 335, 346 (1980) (characterizing a conflict-of-interest claim as one alleging denial of "effective assistance of counsel); *Trevino v. Thaler*, 569 U.S. 413, 425-26 ("Texas courts in effect have directed defendants to raise claims of ineffective assistance of trial counsel on collateral, rather than on direct, review."); *Acosta v. State*, 233 S.W.3d 349 (2007) (recognizing and applying *Cuyler's* standard to ineffective assistance of counsel based on conflict); *U.S. v. Infante*, 404 F.3d 376, 389 (5th Cir. 2005) (treating conflict-of-interest-claims like

ineffective-assistance-of counsel claims); *Ex parte McCormick*, 645 S.W.2d 801, 805 (Tex.Crim.App. 1983) (reversing death sentence in capital case based on trial counsel's conflict of interest and illustrating cognoscibility of claim in spite of no trial objection or appellate presentation); *Ex parte Parham*, 611 S.W.2d 103 (Tex.Crim.App. 1981) (claim permitted on state habeas review without trial objection or appellate presentation, despite conflict arising during trial); *Amaya v. State*, 677 S.W.2d 159, 161 (Tex.App.—Houston [1st Dist.] 1984, pet. ref'd).

The rationale is straightforward: these claims are nearly impossible to raise on direct appeal because the record is typically undeveloped and lacks the factual detail necessary for fair adjudication. *See Trevino v. Thaler*, 569 U.S. 413, 424–25; *Thompson v. State*, 9 S.W.3d 808, 813–14 & n.6 (Tex. Crim. App. 1999) (noting that direct appeals rarely provide a sufficient record to establish ineffective assistance).

Both the State habeas court and the U.S. District Court overlook that this was not merely a "record-based claim," but that substantial evidence supporting this claim—evidence that was unavailable on direct review but presented in Hamilton's state habeas proceedings. This included trial counsel Muldrow's affidavit, in which she acknowledged the conflict's adverse impact on her ability to cross-examine Montoyer, including his criminal history, aliases, motive to lie, the timing of when she learned of the conflict, and the impact it had on her mental state during cross.

These facts were critical to developing Hamilton's Sixth Amendment right-to-counsel claim.

Finally, the U.S. Supreme Court has long held that a state procedural rule cannot bar federal review unless it is firmly established and regularly followed. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988); *Beard v. Kindler*, 130 S.Ct. 612, 614 (2009). As shown above, Texas does not consistently apply such a rule to Sixth Amendment right-to-counsel claims – or to ineffective assistance claims generally, of which this is a subset.

Reasonable jurists could – and would – debate the correctness of the District Court's procedural ruling, and a COA should issue.

## CONCLUSION

Hamilton requests that this Court issue a certificate of appealability for each of his presented constitutional claims, order merits-briefing on these claims, and ultimately find that the District Court's order should be reversed, and that Hamilton's judgment of conviction be set aside, and a new punishment hearing ordered. Hamilton additionally requests all other relief to which he may be entitled.

Respectfully submitted,

*/s/ Jonathan Landers*
**Jonathan Landers**
SBN: 24070101
1018 Preston St., Floor 8
Houston Texas 77002
(713) 685-5000
Jlanders.law@gmail.com
**Attorney for Petitioner Hamilton**

*/s/ Bryan W.L. Garris*
**Bryan W.L. Garris**
SBN: 24079945
1018 Preston St., Floor 8
Houston Texas 77002
bryan@txdefense.net
**Attorney for Petitioner Hamilton**

## CERTIFICATE OF SERVICE

I certify that a copy of this document was served on all counsel of record via ECF on the July 25, 2025.

*/s/ Jonathan Landers*
**Jonathan Landers**

## CERTIFICATE OF COMPLIANCE

1. This brief exceeds the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 16,484 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This Court

granted Hamilton's motion to file brief in support of certificate of appealability in excess of word count but not to exceed 16,500. *See* Doc. no. 34.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Office Word 2010 in 14-Point Times New Roman font.

*/s/ Jonathan Landers*
**Jonathan Landers**

Signed July 25, 2025